1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP

John T. Cox, III (*pro hac vice* pending)
  tcox@gibsondunn.com
  Telephone:  214.698.3256
  Facsimile:  214.571.2923
Karl G. Nelson (admitted *pro hac vice*)
  knelson@gibsondunn.com
  Telephone:  214.698.3203
  Facsimile:  214.571.2945
Ashley E. Johnson (admitted *pro hac vice*)
  ajohnson@gibsondunn.com
  Telephone:  214.698.3111
  Facsimile:  214.571.2949
2001 Ross Avenue
Suite 2100
Dallas, TX 75201

*Attorneys for Defendants AT&T Inc. and AT&T Services Inc.*

GIBSON, DUNN & CRUTCHER LLP

Jennafer M. Tryck, SBN 291088
  jtryck@gibsondunn.com
  Telephone:  949.451.3800
  Facsimile:  949.451.4220
3161 Michelson Drive
Irvine, CA 92612

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Timothy Scott, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>AT&T Inc., et al.,<br><br>          Defendants. | CASE NO. 3:20-CV-07094-JD<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:  Hon. James Donato<br>Action Filed:  October 12, 2020<br>Noticed Hearing:  June 22, 2023 at 10:00 am |

1

## NOTICE OF MOTION FOR SUMMARY JUDGMENT

2      PLEASE TAKE NOTICE that on June 22, 2023 at 10:00 am in Courtroom 11 of the United

3    States District Court for the Northern District of California, before the Honorable James Donato,

4    Defendants will and hereby do move for summary judgment in this purported class action brought

5    under the Employee Retirement Income Security Act ("ERISA").

6      Defendants seek an order granting summary judgment for the Defendants on all of Plaintiffs'

7    claims and dismissing all of Plaintiffs' claims with prejudice.  The grounds for Defendants' motion are

8    set forth below.  In further support of the motion, Defendants submit declarations and certain exhibits

9    attached thereto.

10   Dated:  March 9, 2023

11                                        Respectfully submitted,

12                                            /s/ Ashley E. Johnson

13                                        Ashley E. Johnson  (admitted *pro hac vice*)
                                         John T. Cox, III (*pro hac vice* pending)
14                                        Karl G. Nelson (admitted *pro hac vice*)

15                                        GIBSON, DUNN & CRUTCHER LLP
                                         2001 Ross Avenue
16                                        Suite 2100
                                         Dallas, TX 75201
17                                        Telephone:  214.698.3256
                                         tcox@gibsondunn.com
18                                        knelson@gibsondunn.com
                                         ajohnson@gibsondunn.com
19

20                                        GIBSON, DUNN & CRUTCHER LLP

21                                        Jennafer M. Tryck, SBN 291088

22                                        jtryck@gibsondunn.com
                                         Telephone:  949.451.3800
23                                        Facsimile:  949.451.4220
                                         3161 Michelson Drive
24                                        Irvine, CA 92612
                                         jtryck@gibsondunn.com
25

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION FOR SUMMARY JUDGMENT ................................................................. I

I.      INTRODUCTION ............................................................................................................... 1

II.     BACKGROUND ................................................................................................................. 4

    A.      The AT&T Pension Plan ........................................................................................... 4

    B.      Plan Participants Elect Benefits After Receiving Written Information About their
        Benefit Options. ........................................................................................................ 6

    C.      Procedural History ................................................................................................... 7

III.    LEGAL STANDARD .......................................................................................................... 8

IV.     ARGUMENT ...................................................................................................................... 8

    A.      Plaintiffs Cannot Prove That the Plan's JSA Factors Violate ERISA. .................... 9

        1.      Plaintiffs Cannot Establish an ERISA Violation on the Face of the Plan ......... 11

        2.      The Altman Model Does Not Provide Plaintiffs With the Necessary
               Evidence To Show a Lack of Actuarial Equivalence Even on an
               Individualized Analysis ................................................................................... 16

    B.      Plaintiffs' Anti-Forfeiture and Fiduciary Duty Claims Fail for Some or All Class
        Members. ................................................................................................................ 20

        1.      ERISA's Anti-Forfeiture Provisions Do Not Apply to Plaintiffs And
               Many Proposed Class Members ....................................................................... 20

        2.      AT&T Did Not Breach Any Fiduciary Duty. ................................................... 21

    C.      Plaintiff Fisher Lacks Standing To Bring Any Claim Based on the JSA Factors,
        Requiring Summary Judgment on All Claims for the Pre-Retirement Class .......... 22

    D.      Many of Plaintiffs' Claims Fall Outside the Statutes of Repose and Limitations. ... 23

V.      CONCLUSION ................................................................................................................ 24

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acosta v. Pac. Enters.*,
  950 F.2d 611 (9th Cir. 1991)....................................................................................................21

*Bafford v. Northrop Grumman Corp.*,
  994 F.3d 1020 (9th Cir. 2021)..................................................................................................22

*Estate of Balli v. Plumbers, Pipe Fitters & Mes Local Union No. 392 Pension Fund*,
  2019 WL 2233347 (S.D. Ohio May 23, 2019) .........................................................................19

*Belknap v. Partners Healthcare Sys., Inc.*,
  588 F. Supp. 3d 161 (D. Mass. 2022) .............................................................................9, 14, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)....................................................................................................................8

*Collins v. Teamsters Benefit Tr.*,
  2013 WL 12343709 (N.D. Cal. Dec. 27, 2013) .......................................................................22

*Gordon v. Deloitte & Touche, LLP Grp. Long Term Disability Plan*,
  749 F.3d 746 (9th Cir. 2014)....................................................................................................22

*Heimeshoff v. Hartford Life & Acc. Ins. Co.*,
  571 U.S. 99 (2013)....................................................................................................................21

*Hughes Aircraft v. Jacobson*,
  525 U.S. 432 (1999)............................................................................................................14, 20

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  140 S. Ct. 768 (2020)................................................................................................................23

*Lebahn v. Nat'l Farmers Union Uniform Pension Plan*,
  828 F.3d 1180 (10th Cir. 2016)................................................................................................21

*Livick v. Gillette Co.*,
  524 F.3d 24 (1st Cir. 2008) ......................................................................................................20

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)..................................................................................................................21

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) .....................................................................................................14

*Me. Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020)..............................................................................................................17

Gibson, Dunn & Crutcher LLP

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ................................................................................16

*Miller v. Fortis Benefits Ins. Co.*,
    475 F.3d 516 (3d Cir. 2007) ...................................................................23

*Nissan Fire & Marine Ins. Co. v. Fritz*,
    210 F.3d 1099 (9th Cir. 2000) ..................................................................8

*Pedersen v. Kinder Morgan Inc.*,
    2022 WL 3643485 (S.D. Tex. Aug. 18, 2022) ........................................23

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ................................................................................20

*Schmid v. Cnty. of Sonoma*,
    2021 WL 1118077 (N.D. Cal. Mar. 24, 2021) ..........................................8

*Sec'y of Labor v. Macy's, Inc.*,
    2022 WL 407238 (S.D. Ohio Feb. 10, 2022) .........................................21

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ....................................................................................8

*Standard Ins. Co. v. Morrison*,
    584 F.3d 837 (9th Cir. 2009) ..................................................................11

*Stephens v. U.S. Airways Grp., Inc.*,
    644 F.3d 437 (D.C. Cir. 2011) .................................................................9

*B.K. ex rel. Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ..................................................................20

*US Airways, Inc. v. McCutchen*,
    569 U.S. 88 (2013) ....................................................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................13

*Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program*,
    222 F.3d 643 (9th Cir. 2000) ..................................................................22

*Wise v. Verizon Commc'ns Inc.*,
    600 F.3d 1180 (9th Cir. 2010) ................................................................21

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) ................................................................20

Gibson, Dunn &
Crutcher LLP

iv

**STATUTES**

5 U.S.C. § 8419 ...................................................................................................................13

29 U.S.C. § 1002 ...........................................................................................................20, 21

29 U.S.C. § 1054 .............................................................................................................9, 16

29 U.S.C. § 1055 ...........................................................................................1, 5, 7, 9, 16

29 U.S.C. § 1102 .................................................................................................................21

29 U.S.C. § 1113 .................................................................................................................23

29 U.S.C. § 1132 ...............................................................................................................1, 8

**OTHER AUTHORITIES**

120 Cong. Rec. 3977 (Feb. 25, 1974) (statement of Rep. Perkins) ...........................2, 11, 12

**RULES**

Fed. R. Civ. P. 56 ...................................................................................................................8

**REGULATIONS**

26 C.F.R. § 1(c)(2)(i) .....................................................................................................6, 7, 10

26 C.F.R. § 1.401(a)-11(b)(2) ...............................................................................................12

26 C.F.R. § 1.417(a)(3) ...................................................................................................6, 7, 10

29 C.F.R. § 2509.75-8(D)(2) .................................................................................................21

29 C.F.R. § 4022.23(d)(2) .....................................................................................................13

Rev. Rul. 79-90 ...............................................................................................................1, 11

Gibson, Dunn & Crutcher LLP

## I.    INTRODUCTION

The Plaintiffs—participants in the AT&T Pension Plan ("Plan")—filed this proposed class action under the Employee Retirement Income Security Act ("ERISA") challenging how AT&T, Inc. and AT&T Services, Inc. (collectively, "AT&T") calculate a form of monthly retirement benefit known as a joint and survivor annuity ("JSA").  A JSA pays the participant a fixed monthly amount for the participant's life and, if the participant's beneficiary (*e.g.*, spouse) survives the participant, for the beneficiary's life as well.  Instead of the Plan's ERISA-compliant methodology, Plaintiffs ask the Court to impose their proposed methodology only on a putative class made up of those who *benefit* from their proposal, while leaving intact Plan benefits for those who are *harmed* by their proposal.  This requirement that the Plan provide each individual participant with whichever result is better under his or her unique circumstances cannot be squared with ERISA's requirements.

Employers are not required to offer pension plans but, when they do, Congress enacted ERISA to ensure that participants receive the benefits promised in their plans.  29 U.S.C. § 1132(a)(1)(B).  Accordingly, plan sponsors have broad latitude to set the method by which a plan calculates JSA benefits.  ERISA simply requires that whatever method is chosen results in a JSA that is the "actuarial equivalent" of the alternative Single Life Annuity ("SLA") form of benefit available under the plan, which pays a monthly pension only for the life of the participant.  29 U.S.C. § 1055(d)(1)(B).  ERISA does not define "actuarial equivalent" or dictate the methods or inputs that must be used to calculate JSA benefits.  Instead, it requires only that the Plan disclose the chosen method, and that the method apply one of four general approaches approved by the Internal Revenue Service ("IRS").  Rev. Rul. 79-90, 1979—1 C.B. 155 (codified at 26 U.S.C. § 401(a)(25)).

There is no dispute here that the Plan states AT&T's chosen method for calculating JSA benefits and that AT&T follows those terms to calculate JSA benefits.  Nor is there any dispute that AT&T uses one of the four IRS-approved methods.  *See* Rev. Rul. 79-90.  The only issue before the Court is whether Plaintiffs can show that the JSA conversion factors expressly written into the Plan fall outside ERISA's broad guardrails for calculating JSA benefits.  Plaintiffs cannot make this showing for two independent reasons.

First, Plaintiffs cannot show that the Plan's methodology for calculating JSA benefits is facially impermissible or that it results in JSA benefits for the average participant that are lower than the methodology proposed by Plaintiffs and their expert would yield. The Plan includes a table of set conversion factors—also called "tabular factors" (in reference to the Plan's specific factors, the "JSA Factors")—such as 0.9 or 0.85. The same JSA Factor applies to each participant within a specific category. Under the Plan, the SLA monthly payment is multiplied by the JSA Factor to determine the JSA monthly payment. In enacting ERISA, Congress explicitly endorsed the use of tabular factors so long as they produce actuarially equivalent benefits "in the case of the average participant." 120 Cong. Rec. 3977, 3993 (Feb. 25, 1974) (statement of Rep. Perkins). Actuarial guidance likewise approves of "using flat factors" that determine actuarial equivalence "for the average participant." Ex. 1 (Abraham Rep.) at 79 (quoting Conf. of Consulting Actuaries, 2013 IRS Gray Book, Question 39).

Plaintiffs do not argue that the JSA Factors fail to provide actuarially equivalent benefits for the average participant. Rather, they complain that the JSA Factors fail to provide actuarially equivalent benefits for certain participants if that term is construed to require an individualized analysis for *each* participant. In essence, Plaintiffs contend that plans may not use tabular factors at all, because each participant is entitled to a JSA Factor tailored to his or her individual circumstances. But that is not the law. Indeed, tabular factors are specifically allowed for good reason: they provide transparency, simplicity, and predictability for plan participants. Plaintiffs point to no authority or evidence supporting the contention that such factors are not an accepted means of calculating actuarial equivalence.

Because Plaintiffs have no proof that the JSA Factors are *actually* too low when applied to the average participant, they instead suggest that the JSA Factors cannot possibly be actuarially equivalent because they have not been recently updated despite increases in life expectancies. But Plaintiffs' own actuary expert, Ian Altman, destroys this theory; he testified that the relevant question in this case is whether the *conversion factor* produces actuarially equivalent JSA benefits, not whether the *assumptions* (*e.g.*, mortality, interest) used to derive that conversion factor are reasonable. If the conversion factor produces actuarially equivalent JSA benefits, ERISA's requirements are satisfied,

even if the conversion factor has remained unchanged for many years or if the individual assumptions used to derive the conversion factor are dated or unknown.

Second, and independently, even if it were the case (and it is not) that the JSA Factors must produce results that are actuarially equivalent when viewed for each participant in isolation, Plaintiffs still could not meet their burden of establishing an ERISA violation. Plaintiffs present a single unsupported and flawed argument that the JSA Factors are problematic on an individualized basis: that the JSA Factors provide lower benefits for some participants than they would receive if the Plan determined the value of their JSA benefit by using Altman's preferred interest rates and mortality tables borrowed from the Internal Revenue Code under 26 U.S.C. § 417(e) (the "Section 417(e) assumptions"). Putting aside the fact that Section 417(e) has nothing to do with calculating JSAs (it applies only to calculating lump sums), Plaintiffs could establish liability under this method (the "Altman Model") only if it produces the lowest actuarially equivalent JSA conversion factors, below which any other conversion factor is outside the range of actuarial equivalence. But Plaintiffs present no evidence to suggest that the Altman Model is the actuarially equivalent floor, not even testimony from Altman himself. Altman never states that his Model is the floor. Rather, he merely opines— without any support—that his method is a "conservative" approach that "result[s] in actuarial equivalence." Ex. 3 (Altman Rep.) at 19, 25. Yet, at the same time, he admits that there are at least 15 ways to calculate actuarially equivalent JSA benefits using different versions of the Section 417(e) assumptions, and he never opines that his Model generates for all participants the lowest conversion rates of all the possible methods that meet the standard of actuarial equivalence.

Absent proof that the Altman Model actually anchors the bottom of the range of actuarially equivalent conversion rates, any comparison between the Altman Model and the Plan's JSA Factors is meaningless because it says nothing with respect to where the latter fall relative to the broad statutory standard of actuarial equivalence. The actuarial experts in this case, including Altman, agree that there is no single "correct" way to calculate actuarially equivalent JSA benefits. That is because actuarial practice involves estimating future events. As such, it is undisputed that actuarial equivalence can be achieved using different methods, and different methods can produce actuarially equivalent results. Ex. 14 (Altman Dep. Tr.) at 82:9–15, 88:12–90:5; Ex. 3 at 19, 24; Ex. 1 at 16. Among professional

actuaries, actuarial equivalence is viewed as a range—not a fixed point. Ex. 1 at 39. Congress apparently recognized this, as evidenced by it choosing not to dictate a method that must be used to calculate actuarially equivalent JSA benefits. The Court should decline Plaintiffs' invitation to go far beyond what Congress or any court has ever done—without any support and in direct violation of actuarial principles—to select a single bright line rule (that the record shows is not even accurate) as the litmus test for "actuarial equivalence."

For these reasons, Plaintiffs cannot meet their burden of establishing that the JSA Factors fail to produce actuarially equivalent benefits, and the Court should dismiss all four of their claims.

## II.        BACKGROUND

### A.        The AT&T Pension Plan

The Plan is a defined benefit pension plan that provides eligible AT&T employees with certain retirement benefits. Ex. 4 at 1, 10, 28, 31. AT&T, Inc. sponsors the Plan, and AT&T Services, Inc. is the sole fiduciary and manager of the Plan. Ex. 4 at 30; Ex. 21 at 28:11–16. Through mergers over several decades, the Plan has acquired fifteen other pension plans—all now merged into the Plan as distinct Component Pension Programs ("Programs") with their own governing rules and benefit calculations. Ex. 4 at 2–4, 96; *see also* Ex. 15 at 40:1–9. Under the Plan, a participant's "accrued benefit" is specified as a SLA, which pays the participant a fixed monthly amount for the participant's life. Ex. 4 at 32; *see also* Ex. 15 at 40:18–21. If the participant is married, however, the participant receives a JSA, unless the participant waives the JSA in favor of another form of payment. Ex. 4 at 16–23; *see also* Ex. 15 at 40:10–17. A JSA pays the participant a fixed monthly amount for the participant's life *and* for the participant's spouse's life, if the participant dies first. Ex. 4 at 16–23. The amount the spouse receives varies depending on the program and option; the Plan offers a 50% JSA, a 75% JSA, and a 100% JSA. *See* Ex. 15 at 41:4–9; Ex. 22 at 95:3–8. Under a 100% JSA, after the participant's death, the surviving spouse receives the full monthly amount that the participant received, Ex. 4 at 21–23, while a 50% JSA pays half the monthly amount to the surviving spouse, *id.* at 16–21.

Because the expected duration of a JSA stream of payments is longer than that of a SLA (because a JSA is paid until *both* the participant and the spouse have died, rather than only until the participant dies), ERISA permits plan sponsors to pay participants and beneficiaries receiving a JSA

less on a monthly basis than participants receiving a SLA.  *Id*. at 7.  ERISA grants the plan sponsor discretion to choose the method the plan uses to convert SLAs to JSAs.  *See id.* at 6; Ex. 14 at 24:16–17, 25:13–16; Ex. 1 at 28–29.  The chosen method must be specified in the plan document and conform with one of the four IRS-approved structures for calculating actuarial equivalence.  *See* Rev. Rul. 79-90.  Two of those standards are fixed standards:  (1) specifying the actuarial assumptions (interest rate, mortality tables, etc.) to be used to calculate the conversion rate, or (2) specify the conversion rate itself (*i.e.*, tabular factor), without defining the underlying actuarial assumptions.  *Id.*; *see also* Ex. 1 at 29–31; Ex. 14 at 75:17–20.  Beyond that, ERISA simply directs in general terms that a JSA be the "actuarial equivalent" of a SLA that would have been paid but for the election of the JSA.  29 U.S.C. § 1055(d)(1)(B).

The Plan components at issue here adopted the use of fixed tabular factors to calculate JSA benefits.  The Plan states the JSA Factor that is to be multiplied by the Plan's SLA monthly payment to derive the JSA monthly payment.  Ex. 1 at 44, 28–38.  The JSA Factors differ across the Programs and the type of JSA elected, but all are set, tabular factors.  *See* Ex. 4 at 16–23; Ex. 22 at 95:24–96:12.  There is no dispute that AT&T calculated JSA benefits according to the Plan.

The table below shows each named Plaintiff who has elected retirement benefits, the applicable Program, the type of JSA elected by the Plaintiff, and the Plan's prescribed JSA Factor for that form of benefit.[1]  *See* Ex. 1 at 7–8.  Assuming for the sake of example that the Plan provides a $1,000 monthly benefit payable as a SLA, the table shows the monthly payment that would be made to the Plaintiff for life and then, upon the Plaintiff's death, the monthly payment that would be made to the Plaintiff's spouse for life under a SLA versus the elected JSA.  *Id.* at 26–27.

| Plaintiff | Program | Benefit Selected | JSA Factor | SLA | | JSA | |
|---|---|---|---|---|---|---|---|
| | | | | Participant | Spouse | Participant | Spouse |
| Gilchrist | Non-bargained | 50% JSA | 0.90 | **$1,000** | **$0** | **$900** ($1,000 x 0.90) | **$450** (50% of $900) |
| Maldonado-Valtierra | Southwest | 50% JSA | 0.90 | **$1,000** | **$0** | **$900** ($1,000 x 0.90) | **$450** (50% of $900) |

---

[1]   Plaintiff Karen Fisher has yet to elect her retirement benefits.  Ex. 17 at 42:18–23.

Gibson, Dunn & Crutcher LLP

| Plaintiff | Program | Benefit Selected | JSA Factor | SLA | | JSA | |
|---|---|---|---|---|---|---|---|
| | | | | Participant | Spouse | Participant | Spouse |
| Griffin | Southeast Management | 50% JSA | 0.90 | **$1,000** | **$0** | **$900** ($1,000 x 0.90) | **$450** (50% of $900) |
| Dougherty | AT&T Legacy Bargained | 50% JSA | 0.92 | **$1,000** | **$0** | **$920** ($1,000 x 0.92) | **$460** (50% of $920) |
| Scott | West | 75% JSA | 0.85 | **$1,000** | **$0** | **$850** ($1,000 x 0.85) | **$637.50** (75% of $850) |
| Rhodes | Southeast | 75% JSA | 0.85 | **$1,000** | **$0** | **$850** ($1,000 x 0.85) | **$637.50** (75% of $850) |
| Koval | AT&T Legacy Management | 100% JSA | 0.85 | **$1,000** | **$0** | **$850** ($1,000 x 0.85) | **$850** (100% of $1,000) |
| Kelly | AT&T Legacy Management | 100% JSA | 0.882 | **$1,000** | **$0** | **$882** ($1,000 x 0.882) | **$882** (100% of $882) |
| Walshon | Non-bargained | 100% JSA | 0.80 | **$1,000** | **$0** | **$800** ($1,000 x 0.80) | **$800** (100% of $800) |

**B.     Plan Participants Elect Benefits After Receiving Written Information About their Benefit Options.**

Before a participant retires, she elects her preferred form of benefit (*e.g.*, lump sum, SLA, 100% JSA, 75% JSA, 50% JSA).  To help participants approaching retirement make this important decision, AT&T Services educates participants about the Plan's menu of benefit options so that participants can make the best decision for them based on their individual and family circumstances.  Ex. 4 at 64–65.  AT&T Services provides the participant with a copy of the Plan, a Summary Plan Description, an individualized Pension Modeling Statement, and a Payment Election Form.  *E.g.*, Ex. 5, Ex. 6.

Included in the individualized Pension Modeling Statement is a Relative Value Notice ("Notice") that provides a written comparison of the various forms of benefits available to the participant, as required by 26 C.F.R. § 1.417(a)(3)-1 (the "Notice Regulations").  *E.g.*, Ex. 8 at 6; Ex. 26 at 7; Ex. 25 at 6–7; Ex. 24 at 6–7; Ex. 27 at 11–12; Ex. 6 at 11; Ex. 28 at 6–7; Ex. 29 at 7.  The Notice Regulations permit—but do not require—plan sponsors to use, as AT&T did, the Section 417(e) assumptions to reduce to a present value the different forms of benefit to be compared in the Notices.  26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B).  Accordingly, AT&T's Notices show a comparison of the value the participant will actually receive if she elects the JSA using the JSA Factors with the value that she

would receive if she instead elected a SLA form of benefit, both converted to a present value using certain Section 417(e) assumptions. *See* Ex. 21 at 179:25–180:14. The result typically is shown in the Notice as a percentage that reflects a measure of the difference between the present value of the JSA (using the JSA Factors) relative to the present value of the SLA.[2]

After receiving the Notices and other information about the Plan and before electing benefits, the participant must sign a Payment Election Form, certifying review of the documents and memorializing the chosen benefit option. *Eg.*, Ex. 4 at 64–65; Ex. 16 at 51:15–21; Ex. 18 at 133:23–137:15. With all of this information in hand, each named Plaintiff who has commenced benefits chose a type of JSA. And most did so more than four years before this suit commenced.[3] *See* Ex. 3 at 17.

## C.  Procedural History

Plaintiffs filed this purported class action on October 12, 2020. Dkt. 1. They allege four ERISA claims against AT&T, each of which requires a showing that the Plan violates ERISA by failing to provide JSA benefits that are the "actuarial equivalent" of SLA benefits. 29 U.S.C. § 1055(d)(1)(B). *See* Dkt. 119 at 10 (Plaintiffs conclude that "all four causes of action in the [Second Amended Complaint] . . . center[ ] on whether Defendants' reduction factors satisfy ERISA's actuarial equivalence requirement."). Specifically, Plaintiffs claim the Plan fails to provide actuarially equivalent JSA benefits in violation of ERISA Section 204(c)(3) (**Count I**) and Section 205(d) (**Count III**). Second Amended Complaint ("SAC"), Dkt. 88 ¶¶ 115–126, 138–150. Plaintiffs also contend that the Plan's alleged failure to provide actuarially equivalent JSAs violates the anti-forfeiture rules in ERISA § 203(a) (**Count II**), and constitutes a breach of fiduciary duty under ERISA § 502(a) (**Count IV**). *Id.* ¶¶ 127–137, 151–162.

---

[2]   The Notice Regulations dictate how different relative values must be communicated in the Notices. When the JSA has a relative value below 95% or above 105% of the SLA, the Notice must provide a numerical comparison of relative values. 26 C.F.R. § 1.417(a)(3)-1(c)(2)(i). However, when the JSA has a relative value between 95% and 105% of the SLA, the Notice Regulations deem the JSA to be "approximately equal in value" to the SLA, and the Notice can simply state that the JSA is "approximately equal in value" to the SLA. *Id.* § 1.417(a)(3)-1(c)(2)(iii)(C).

[3]   Additionally, some Plan participants entered into severance agreements, under which they expressly released any "claims under . . . ERISA" and agreed to "not bring, maintain or participate in any class action, collective action or representative action." *E.g.*, Ex. 11. If a class is certified here, the effect of such releases would have to be litigated on an individualized basis.

Plaintiffs concede that some Plan participants have received or will receive actuarially equivalent benefits under the JSA Factors, and thus they do not seek to include all Plan participants in their class.  Instead, they moved to certify two classes:  (1) a subset of Plan participants and their beneficiaries who are currently receiving an allegedly lower JSA benefit under the JSA Factors than they would under Plaintiffs' proposed method ("Retired Class"); and (2) Plan participants and their beneficiaries who have not begun receiving benefits and accordingly have not yet elected the form in which they will receive such benefits ("Pre-Retirement Class").  Dkt. 119.  AT&T opposed Plaintiffs' certification motion and moved to exclude the testimony of Plaintiffs' expert, Ian Altman, in support of that motion.  Dkts. 121, 122.  Those motions are still pending.  AT&T now moves for summary judgment on all claims.  AT&T also concurrently files motions to exclude all opinions and testimony of Plaintiffs' experts David Pratt and Ian Altman at the merits stage.

## III.    LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the moving party does not bear the ultimate burden of proof, it can satisfy its initial summary-judgment burden by identifying "an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Then, the burden "shifts to the nonmoving party to 'produce evidence to support its claim or defense.'"  *Schmid v. Cnty. of Sonoma*, 2021 WL 1118077, at *2 (N.D. Cal. Mar. 24, 2021) (Donato, J.) (quotation omitted).  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Nissan Fire & Marine Ins. Co. v. Fritz*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## IV.    ARGUMENT

Plaintiffs cannot meet their burden to show that the JSA Factors fall outside the range of actuarial equivalence (*infra* Section IV.A), both because they cannot premise their claims on analyzing each participant individually and because Plaintiffs have failed to offer proof that any participant's JSA falls below the lowest actuarially equivalent amount even if each individual is evaluated in isolation.  Moreover, several of their claims fail for some or all putative class members for additional and independent reasons (*infra* Section IV.B).

Gibson, Dunn & Crutcher LLP

8

### A.    Plaintiffs Cannot Prove That the Plan's JSA Factors Violate ERISA.

Employers are not required to provide pension plans to their employees.  *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983).  For employers that choose to provide such plans, Congress enacted ERISA to ensure that employees receive the benefits promised in their plans.  *See* 29 U.S.C. § 1132(a)(1)(B).  As such, ERISA's "principal function" is "to protect contractually defined benefits" and its "focus [is] on what a plan provides." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (quotation and citation omitted).  Plaintiffs seek to impose a standard on AT&T that departs from the Plan's written terms and extends beyond any requirement in ERISA.

ERISA § 205(d) requires defined benefit plans to offer married participants a JSA that is the "actuarial equivalent" of a SLA for the life of the participant.  29 U.S.C. § 1055(d)(1)(B).  Similarly, ERISA § 204(c)(3) provides that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age [65 years old,] . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit." *Id.* § 1054(c)(3).

ERISA does not define the phrase "actuarial equivalent."  Courts and experts, including Plaintiffs' expert Ian Altman, call it a "term of art." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (citing Jeff L. Schwartzmann & Ralph Garfield, Education & Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991)); *see also* Expert Rep. of Ian Altman filed in *Belknap v. Partners Healthcare Sys., Inc.*, No. 1:19-cv-11437, Dkt. 69-3 at 2 (D. Mass.) ("'Actuarial equivalence' is a term of art to actuaries . . . .").  As Altman explained, when determining actuarially equivalent benefits, professional actuarial practice requires following a plan's terms governing the "conver[sion] from one form of benefit to another." *Belknap*, 588 F. Supp. 3d 161, 174 (D. Mass.) (quoting Altman deposition testimony), *appeal dismissed*, 2022 WL 4333752 (1st Cir. Aug. 30, 2022).[4]

One reason actuaries focus on applying the terms of the plan is that there is no single "correct" way to calculate actuarially equivalent JSA benefits.  That is because "actuarial practice commonly involves the estimation of uncertain events." Ex. 1 at 39.  The experts in this case agree that actuarial

---

[4]   As addressed in Defendants' concurrently filed Motion to Exclude Mr. Altman, this is not the approach Altman takes here when he attempts to define the putative class and calculate damages.

equivalence can be achieved using different methodologies, and that different methodologies can nevertheless each produce actuarially equivalent results. Ex. 14 at 82:9–15, 88:12–90:5; Ex. 3 at 19, 24; Ex. 1 at 39.  As such, among professional actuaries, and as reflected in applicable regulations, actuarial equivalence is viewed as a *range*—not a single, fixed point.  Ex. at 39 ("Because actuarial practice commonly involves the estimation of uncertain events, there will often be a range of reasonable methods and assumptions, and two actuaries could follow a particular ASOP, both using reasonable methods and assumptions, and reach different but reasonable results."); Ex. 14 at 169:21–170:19 (explaining he determined actuarial equivalence by identifying a range of conversion factors).  This result is bolstered by the Notice Regulations that Plaintiffs rely on to support their theory, which state a JSA with a relative value within 5% of the SLA is deemed "approximately equal" to the SLA.  *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iii)(C).[5]

Importantly, the experts further agree that the key question in this case is whether the conversion factors produce actuarially equivalent JSA benefits.  Ex. 14 at 25:13–16, 206:5–9, 236:1–19.  The *assumptions* or inputs (*e.g.*, mortality table, interest rate) that were used, if any, to derive a conversion factor are irrelevant to that issue.  *Id.* at 236:1–19; Ex. 13 at 80:2–23.  Plaintiffs cannot meet their burden of proving the Plan fails to produce JSA benefits within the range of actuarial equivalence and thus all of their claims fail as a matter of law.

---

[5]   As explained above, the Notice Regulations permit—but do not require—plan sponsors to, as AT&T did, use Section 417(e) assumptions in calculating the present value of alternative forms of benefits in the Notices.  26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv)(B).  Accordingly, for this purpose, AT&T is permitted to, and does, calculate the relative value of a participant's JSA by comparing the value of the JSA (determined using the JSA Factors) to the value of the SLA, where both values are represented by a present value (using the Section 417(e) assumptions).  If actuarial equivalence required mathematical equality under the Section 417(e) assumptions, then the Notice Regulations would require the relative value of the JSA to always be 100% of the SLA.  Far from such a requirement, the Notice Regulations explicitly contemplate that JSAs could have a relative value that is more than 5% below the SLA calculated under Section 417(e).  *See* 26 C.F.R. § 1.417(a)(3)-1(c)(2)(i) (explaining how the Notices must communicate a JSA with a relative value below 95% of the SLA).  If the Court were to adopt Plaintiffs' definition of actuarial equivalence, it would require the creation of some bright line standard that the Notice Regulations make clear does not exist.

**1.      Plaintiffs Cannot Establish an ERISA Violation on the Face of the Plan.**

AT&T acted within its discretion as a plan settlor in adopting a Plan that calculates actuarially equivalent JSA benefits using tabular factors, and it is undisputed that AT&T calculates JSA benefits according to the Plan's terms.  Nevertheless, Plaintiffs challenge the JSA Factors because:  (1) for some individual participants, they lead to lower JSA benefits than those produced under the Altman Model; and (2) they have remained constant for many years.  Both arguments are meritless.

With respect to the first argument, Plaintiffs' attempt to challenge actuarial equivalence for individual participants based on an analysis of each participant's unique circumstances is ill-founded, as actuarial equivalence is properly decided on a *pooled*, or average, rather than individualized, basis. And once the inquiry is properly framed, Plaintiffs have no evidence—and indeed, do not even contend—that the Plan provides less than actuarially equivalent benefits to the average participant. With respect to the second argument, Plaintiffs' own expert concedes that tabular factors are reasonable or not based on the JSA benefits they yield, not the length of time they have been in place.  AT&T's continued use of the same tabular factors over many years thus cannot compensate for Plaintiffs' failure to offer *proof* that the Plan's tabular factors are not actuarially equivalent on a pooled basis.

**a.      Plaintiffs Do Not Dispute That AT&T May Use Tabular Factors To Calculate JSA Benefits.**

Plaintiffs do not (and cannot) directly challenge the Plan's design to use tabular factors, which apply uniformly to all participants within distinct categories, instead focusing their attack on the specific tabular factors AT&T chose.  This is unsurprising, given that ERISA's legislative history relating to the undefined term "actuarial equivalence" explicitly endorses tabular factors.  Specifically, Representative Perkins noted that the "reduction permitted on the basis of actuarial equivalence [in calculating JSAs] need not involve a variety of reductions dependent on the life expectancy of each participant and of the participant's spouse"; instead, a "uniform reduction or a simplified schedule of reductions will fulfill the intent of this provision if it can be established to provide actuarial equivalence in the case of the average participant."  120 Cong. Rec. at 3993.

Consistent with Congress's intent in enacting ERISA, Revenue Ruling 79-90 explicitly permits plan sponsors to use tabular factors to calculate JSA benefits.  *See* Rev. Rul. 79-90.  Not surprisingly,

Gibson, Dunn & Crutcher LLP

Altman testified that he has served plans that use tabular factors. Ex. 14 at 36:8–10. Indeed, Altman conceded that whether a plan uses tabular factors is *immaterial* to whether participants receive actuarially equivalent JSA benefits. *Id.* at 25:25–26:5, 36:8–10, 76:8–14.

Not only are tabular factors allowed under the law, they also provide substantial advantages to plan participants. Tabular factors are easy to apply and, with simple math, allow participants to know exactly the benefit amount they will receive from the moment they enter into the plan, which enables them to make long-term retirement plans. Ex. 2 (Abraham Rebuttal Rep.) at 14–15. This transparency, predictability, and simplicity is lost under other methods (like the ones Plaintiffs propose) that use more complicated calculations based on variable inputs, like mortality tables and interest rates, that can be unknown until the participant is on the cusp of retirement and can vary dramatically (and unpredictably) based on the particular economic conditions when the participant retires. *Id.*

> **b.**   **Plaintiffs' Insistence on Individualized Analysis Would Effectively Eliminate the Use of Tabular Factors, Contrary to Congressional Intent.**

Plaintiffs cannot directly contest AT&T's authority to use tabular factors, so they attack it indirectly, arguing that the use of tabular factors complies with ERISA only if every single participant's JSA is the actuarial equivalent of his or her forgone SLA. But to say that a tabular factor is only permissible if it means that every participant receives through a JSA the actuarial equivalent of an SLA in his or her individual circumstances destroys the notion of pooling and equivalence for the average participant, contrary to clear congressional intent. After all, the *entire point* of tabular factors is to apply a common factor equally to all participants in a program, thus pooling risk across that group. *Cf. Standard Ins. Co. v. Morrison*, 584 F.3d 837, 844 (9th Cir. 2009) ("Risk pooling involves spreading losses over all the risks . . . ." (quotation and citation omitted)). Adopting a tabular factor high enough to ensure that the JSA of a healthy participant with a much older, terminally ill spouse, is actuarially equivalent to that participant's SLA if that participant is considered in isolation would require setting the tabular factor at very near 1.00. But when that extremely high tabular factor is then applied to virtually any other participant, the other participants would receive a disproportionately large JSA. Rather than a tabular factor that provides actuarial equivalence for the *average participant*, Plaintiffs want the tabular factor to be anchored to the most extreme outlier among the population of participants.

Gibson, Dunn &
Crutcher LLP

Pooling is a fundamental principle of actuarial science that entails the aggregation of individual risk for common treatment.  Ex. 1 at 13, 34–35.  As noted above, ERISA allows plans to use tabular factors so long as they "provide actuarial equivalence *in the case of the average participant*."  120 Cong. Rec. at 3993 (emphasis added).  Actuarial guidance likewise approves of "using flat factors which are reasonable for the average participant expected to elect the option" as an approach to determining actuarial equivalence.  Ex. 1 at 75.[6]  Accordingly, tabular factors are necessarily evaluated on a pooled basis (*i.e.*, based on the outcome for the average participant).

The unworkability of Plaintiffs' proposal to use individualized conversion factors is highlighted by their gerrymandered proposed class.  Plaintiffs acknowledge that many Plan participants receive higher benefits under the Plan's tabular factors than under their Altman Model, such that they would have no claim that they are not receiving actuarially equivalent benefits.  Dkt. 119 at 15–16. Accordingly, Plaintiffs simply push those participants out of the class and assume that AT&T should continue applying the JSA Factors to them.  *Id.* at 16; Dkt. 131 at 4 (Plaintiffs state they "certainly do not intend to ask the Court to reduce anyone's benefits.").  But this Court should not ignore those Plan participants, whose existence confirms that Plaintiffs' approach does not work on either the merits or for class certification.

On the merits, Plaintiffs' cake-and-eat-it-too gambit undermines the pooling inherent in the use of tabular factors and replaces it with a "best of" approach under which the Plan would be required to employ whichever conversion approach yielded the greater benefit amount for each individual participant.  But ERISA does not require AT&T to give each retiree whichever conversion formula is most generous to that particular retiree's individual circumstances.  ERISA requires only that AT&T use a conversion formula that provides actuarially equivalent benefits to the average participant. Plaintiffs' focus on individual participants' results also highlights the highly individualized analysis that would be necessary in this case if Plaintiffs were correct that actuarial equivalence must be considered on the basis of each individual participant.  For *every putative class member*, Plaintiffs and

---

[6]   Pooling is also permitted by the regulations on which Plaintiffs rely.  *E.g.*, 26 C.F.R. § 1.401(a)-11(b)(2) ("Equivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants . . . .").

the Court would have to analyze that participant's personal situation (*e.g.*, age, spouse age, health, family medical history) and assess whether the JSA benefit the class member is receiving could be actuarially equivalent under any acceptable formula (of which Altman alleges there are at least 15).  In short, Plaintiffs' insistence on an individualized approach, rather than accepting factors applied on a pooled basis, makes the "common answers" required for litigation on a class-wide basis impossible. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

In sum, the fact that Plaintiffs would prefer the Plan use the existing JSA Factors only when it benefits a certain individual does not amount to a violation of ERISA's requirement of actuarial equivalence for the *average participant*, and their argument is foreclosed by Congress's and the IRS's approval of tabular factors on a pooled basis.

> ### c.     Plaintiffs Offer No Evidence on the Correctly Framed Inquiry of Whether the Plan Offers JSA Benefits that Are Actuarially Equivalent on a Pooled or Average Basis.

On the key question of whether the JSA Factors, on average, produce actuarially equivalent benefits, Plaintiffs and their expert offer nothing; they do not even attempt to analyze the Plan's factors on a pooled basis, nor do they contend that the factors are impermissible for the average participant. Without such evidence, Plaintiff have failed to create a genuine dispute before the Court on any of their claims.[7]

Further, comparing the JSA Factors to other tabular factors used in the actuarial industry bolsters the conclusion that the JSA Factors provide actuarially equivalent benefits.  For example, both the Pension Benefit Guaranty Corporation and the Federal Employee Retirement System use a tabular factor of 0.90 to convert a SLA to a 50% JSA. Ex. 1 at 31; 5 U.S.C. § 8419; 29 C.F.R. § 4022.23(d)(2). The JSA Factor for each Plaintiff who elected a 50% JSA is *at least* as high as those in these examples. *Supra* Section II.A.  Even Plaintiffs acknowledge that the JSA Factors provide *greater* than actuarially equivalent benefits for many Plan participants.  Dkt. 119 at 15–16.

---

[7]   Notably, the only evidence that *is* in the record on whether the Plan results in actuarially equivalent benefits for the average participant is that it does.  As Altman acknowledged, one way that an actuary can evaluate whether the JSA Factors produce actuarial equivalence "is by comparing them to actuarial assumptions that the actuary is confident provide actuarial equivalence."  Ex. 3 at 19. Abraham did just that and concluded that the JSA Factors produce at least actuarially equivalent JSA benefits for the average group member.  Ex. 1 at 54.

Gibson, Dunn &
Crutcher LLP

### d. Plaintiffs Cannot Overcome Their Fatal Lack of Proof that the JSA Factors Are Too Low by Noting That the Plan Does Not Regularly Change Those Factors.

Because they cannot legitimately challenge the use of tabular factors for the pooled group of all Plan participants, Plaintiffs instead argue that the JSA Factors are flawed because they have remained unchanged for years despite increases in life expectancies. *See* SAC ¶¶ 79–81. But courts have recognized that Sections 205 and 204 do "not specifically require that retirement plans periodically adjust their" actuarial assumptions, and that Congress could have required that had it wanted to. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 206 (2d Cir. 2007); *see also Hughes Aircraft v. Jacobson*, 525 U.S. 432, 446 (1999); *Belknap*, 588 F. Supp. 3d at 176 (no ERISA violation even though plan was written "50 years ago" using assumptions that "seem to be clearly out of date, at least when viewed from the perspective of 2022").

Even if Plaintiffs' argument were not wrong on the law, their own expert conceded that the permissibility of the JSA Factors turns on the results they yield, not the assumptions on which they rest and regardless of whether those assumptions are outdated or unknown. Ex. 14 at 236:7–19, 205:22–207:9, 196:20–25. Altman explained that the conversion factors "could be picked or selected without regard to [interest and mortality] tables" or "selected on a basis that the employer no longer knows what went into them." *Id.* 25:25–26:16. The use (or lack of use) of certain assumptions does not determine whether a conversion factor is actuarially equivalent, and the same conversion factors could be calculated based on any number of assumptions—both reasonable and unreasonable assumptions. Ultimately, "it is the conversion rates that are calculated using those . . . assumptions that matter." *Id.* 236:1–19. Accordingly, if the conversion factor produces actuarially equivalent JSA benefits, ERISA's requirements are satisfied, regardless of how and when that conversion factor came to be.

Plaintiffs are also wrong to assume that, because the JSA Factors have not changed in recent years despite increases in life expectancies, those JSA Factors are necessarily lower than they would be if updated with current mortality tables. The testimony of both experts makes clear that this simplistic assumption does not hold up. As both experts have explained, a JSA conversion factor is a *ratio* of present values: the present value of a SLA (numerator) / the present value of a JSA (denominator). Ex. 1 at 27, 31–32; Ex. 14 at 80:2–81:01. Any change in life expectancy would affect

both the numerator *and* the denominator (by impacting both present values), and thus does not have a universal and predictable effect on the *ratio* (the JSA conversion factor). Ex. 1 at 31–34.[8] Put another way, a longer life expectancy increases the value of an SLA at a certain monthly amount (assuming the interest rates are held constant); but it *also* increases the value of a JSA at a percentage of that certain monthly amount (again, assuming constant interest rates). That *both* a SLA and a JSA are worth more if the participant and his or her spouse have longer life expectancies does little to change the ratio between the SLA and JSA. Indeed, Plaintiffs acknowledge that many Plan participants—i.e., the ones that Plaintiffs have excluded from their putative class—would receive *lower* benefits if the Plan applied the updated assumptions (including mortality tables) that Altman proposes.

It is not surprising Altman testified that neither the age of the JSA Factors nor the underlying assumptions used or not used to devise them was a basis for his opinion that the JSA Factors were not actuarially equivalent. *See* Ex. 14 at 170:10–19. As such, Plaintiffs cannot establish an ERISA violation based on the JSA Factors' age or underlying assumptions.

### 2. The Altman Model Does Not Provide Plaintiffs With the Necessary Evidence To Show a Lack of Actuarial Equivalence Even on an Individualized Analysis.

Even assuming *arguendo* that tabular factors must produce actuarially equivalent JSA benefits for each individual participant (and they need not), Plaintiffs still present no evidence to establish an ERISA violation. Plaintiffs' sole argument for why the JSA Factors are problematic on an individualized basis is that they are lower for certain (but not nearly all) Plan participants than the conversion factors calculated using the Altman Model. SAC ¶ 53; Ex. 14 at 170:10–19 (admitting the *only* reason he concluded that some JSA Factors were not actuarially equivalent is because they are lower than those produced under the Altman Model). To prove their case under this theory, Plaintiffs must demonstrate that the Altman Model produces the lowest actuarially equivalent JSA conversion factors, below which any other conversion factor is outside the range of actuarial equivalence. Without showing the floor for actuarial equivalence, Plaintiffs cannot show that the JSA Factors lead to benefits below that floor. But Altman never actually opines that his Model is the floor and certainly provides

---

[8]   It also is inappropriate to generalize about the impact of one assumption in isolation on conversion factors. The effect of any change in one assumption must take into account the combined effect of all assumptions—including both mortality and interest rate. Ex. 1 at 27, 32–33.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 3:20-CV-070940-JD

Gibson, Dunn & Crutcher LLP

1   no analysis to explain why it would be the floor.  Accordingly, Plaintiffs' claim that some participants

2   will receive less than they would under the Altman Model falls far short of showing that those

3   participants are receiving benefits that are not actuarially equivalent, even when each participant is

4   improperly viewed in isolation.

5              a.      **ERISA Provides No Basis for Imposing the Arbitrary Altman Model
                       on Plans.**

6

7              Neither ERISA nor its regulations requires use of the Altman Model to determine actuarial

8   equivalence.  That model attempts to graft the Internal Revenue Code's Section 417(e) assumptions,

9   which prescribe the method for reducing certain future payment streams to a present value, as may be

10  done when calculating a lump sum distribution, onto the sections of ERISA under which Plaintiffs

11  principally assert their claims (Sections 205(d) and 204(c)(3)).  But these ERISA Sections do not

12  specify *how* actuarial equivalence is to be calculated or what assumptions or factors should underlie

13  the calculations, nor do they involve reducing the stream of benefits to a present value.  At most, all

14  these Sections require is that an average participant's anticipated JSA stream of payments *be* the

15  actuarial equivalent of her SLA benefits.  *E.g.*, 29 U.S.C. §§ 1054(c)(3), 1055(d).  Courts must assume

16  that this "omission from the text of ERISA is deliberate."  *Belknap*, 588 F. Supp. 3d at 170.  The

17  Supreme Court has repeatedly emphasized that ERISA's "carefully crafted and detailed enforcement

18  scheme provides strong evidence that Congress did *not* intend to authorize other remedies that it simply

19  forgot to incorporate expressly."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quotation and

20  citation omitted).  Indeed, one court has held that ERISA's comprehensive coverage means that, in the

21  absence of an explicit "reasonableness standard" for the factors used to convert SLAs to JSAs, no such

22  reasonableness requirement exists.  *Belknap*, 588 F. Supp. 3d at 175.  But this Court need not here

23  reach the question of whether Congress implied any reasonableness standard in the actuarial

24  equivalence standard, because Plaintiffs have proffered no evidence that such a standard would require

25  the use of the Altman Model or even that the Altman Model produces the lowest "reasonable"

26  actuarially equivalent JSA conversion factors.

27            In fact, Congress unambiguously did *not* require that employers use specific assumptions when

28  converting benefits under Sections 205(d) or 204(c)(3).  Congress knew how to do so where it chose

to; indeed, Congress did just that in Section 205(g)(3), which requires employers to use specific assumptions (incidentally, the same that Plaintiffs want here) when converting SLAs to lump sums. 29 U.S.C. § 1055(g)(3). Congress's choice *not* to include a requirement to use specific assumptions in Sections 205(d) or 204(c)(3), despite doing so elsewhere in ERISA, means that courts must assume that Congress did not intend for Sections 205(d) or 204(c)(3) to require the use of any specific assumptions—including the Section 417(e) assumptions. *See Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) ("[W]hen Congress includes particular language in one section of a statute, but omits it in another, Congress intended a difference in meaning." (quotation and citation omitted)).

### b.    Plaintiffs Have No Evidence that the Altman Model Is the Lowest Threshold for Actuarial Equivalence.

Plaintiffs' sole support for their claim that certain participants' JSA benefits are not actuarially equivalent is Altman's testimony. But Altman *never* states that his Model represents the floor, below which any other conversion factor would not produce an actuarially equivalent result. Instead, he only asserts—without any support—that his method is a "conservative" approach that "result[s] in actuarial equivalence," Ex. 3 at 19, 25, and vaguely suggests that his approach "fall[s] at the low end of a reasonable range," Dkt. 119-9 at 43. This assertion falls far short of the ultimate conclusion that is *required* for Plaintiffs to prevail.

A cursory review of Altman's definition of actuarial equivalence demonstrates why Plaintiffs cannot rely on Altman to establish the floor for actuarially equivalent benefits. Altman concedes that his Model is one of at least *15* different methods to calculate JSA benefits using the Section 417(e) assumptions—depending on the length of the period over which the interest rates used are held stable (*e.g.*, one month, one quarter, or one year), and the date preceding retirement on which such rates are measured (*e.g.*, a 1-month to a 5-month period)—*all of which produce actuarially equivalent JSA benefits*. Dkt. 119-9 at 24; Ex. 14 at 317:3–25. It follows that, under Altman's definition of actuarial equivalence, the Altman Model could serve as the floor for actuarial equivalence *if and only if* it produced lower conversion rates for all participants than any other acceptable approach, including those produced under each of the other 14 possible methods using the Section 417(e) assumptions. But

Altman never analyzed the other 14 methods, and his failure to do so is fatal.  Plaintiffs cannot prove an ERISA violation by arguing that the JSA Factors produce lower results than *1 of 15 possible* Section 417(e) methods when those JSA Factors may still yield a greater benefit payment than some or all of the other *equally acceptable* Section 417(e) methods.

Further, the record reveals that the Altman Model does not, in fact, produce the lowest conversion factors of all of the 15 separate Section 417(e) methods approved by Altman.  The table below shows five examples of class records where one of Altman's other 14 Section 417(e) methods— using a one-month lookback and a monthly stability period—produces a lower conversion factor than the Altman Model.[9]  *See* Ex. 2 at 73–75.  And indeed, there is no reason—and Altman offers none—to think that any one of the 15 approaches that could be taken under Section 417(e) would be the lowest for all participants.

| ID | Plan JSA Factor | Altman Model's 417(e) JSA Factor | Alternative 417(e) JSA Factor | Alternative, 417(e) Lookback/Stability Period |
|---|---|---|---|---|
| 44433 | 0.90 | 0.9026 | 0.8989 | 1-month/Monthly |
| 17861 | 0.92 | 0.9205 | 0.9164 | 1-month/Monthly |
| 9863 | 0.85 | 0.8532 | 0.8472 | 1-month/Monthly |
| 86369 | 0.90 | 0.9008 | 0.8955 | 1-month/Monthly |
| 123703 | 0.92 | 0.9217 | 0.9177 | 1-month/Monthly |

Having agreed that a conversion factor produced under this alternative method *is* actuarially equivalent, Altman must necessarily acknowledge that his Model did not identify the lower limit for actuarial equivalence.  Critically, in each example, the JSA Factor applied by AT&T is below that produced under the Altman Model but *above* that produced under the alternative Section 417(e) approach.  It follows that the JSA Factor in each example is actuarially equivalent *even under Altman's theory of actuarial equivalence*, despite being lower than that produced under the Altman Model. Altman cannot dispute this reality.

---

[9]   The "stability period" is the period during which the applicable mortality table and interest rate remain constant with respect to all participants commencing benefits during that period.  Ex. 2 at 6–7, n.3.  The stability period can be annual, quarterly, or monthly.  *Id.*  The "lookback month" is the reference month before the stability period.  *Id.*  The lookback month can be either one, two, three, four, or five months.  *Id.*

Altman also knowledges that "at least some actuaries" define the concept of "actuarial equivalence" differently than he does.  Ex. 14 at 29:25–31:5.  And he concedes that the Section 417(e) assumptions "are not the only reasonable actuarial basis for determining [JSA] payments in a qualified pension plan." Ex. 3 at 24; *see also id.* at 19.  Indeed, Section 417(e) actually governs calculating the present value of a future pension benefit for purposes of paying a lump sum, a different inquiry than calculating actuarial equivalence between two forms of future payments.  Altman explains, for example, that using an interest rate based on a 10-year trailing average of a certain bond yield—a factor that has no basis in Section 417(e)—would also generate an actuarially equivalent JSA benefit.  Dkt. 119-9 at 43–44.  And beyond this example, Altman testified that there could "be other reasonable factors" he has not identified.  Ex. 14 at 29:4–7.  But Altman does not perform the analysis that would be necessary to determine whether each putative class member is receiving JSA benefits below not only what the Altman Model's calculated conversion factors would yield, but below those that would result from *any* possible actuarially equivalent method.

Because Plaintiffs cannot come close to showing that the Altman Model is the lowest boundary of actuarial equivalence, the Court should decline Plaintiffs' invitation to go far beyond Congress's purposefully adopted standard and what any court has ever done—without any support and in direct conflict with fundamental actuarial principles—to define "actuarial equivalence" using a bright-line rule that the record in this case shows is not even the outer limit of that concept.

**B.  Plaintiffs' Anti-Forfeiture and Fiduciary Duty Claims Fail for Some or All Class Members.**

**1.  ERISA's Anti-Forfeiture Provisions Do Not Apply to Plaintiffs And Many Proposed Class Members.**

Plaintiffs—and many other proposed class members—cannot maintain an action against AT&T for violating ERISA's anti-forfeiture provisions.  ERISA § 203(a) requires that a pension plan "provide that an employee's right to his normal retirement benefit is nonforfeitable upon attainment of normal retirement age."  Section 203(a) does not cover early retirement benefits; it applies to only "normal retirement benefit[s]." *Belknap*, No. 19-cv-11437, Dkt. 33 at 8 (Jan. 24, 2020); *see also Estate of Balli v. Plumbers, Pipe Fitters & Mes Local Union No. 392 Pension Fund*, 2019 WL 2233347, at *4 (S.D. Ohio May 23, 2019).  All named Plaintiffs who have commenced benefits payments did so *before*

Gibson, Dunn & Crutcher LLP

normal retirement age (here, age 65).  Ex. 3 at 17.  Thus, Section 203(a) does not apply to them and they lack standing to pursue such a claim on behalf of themselves or other putative Retired Class members.  Similarly, because the members of the putative Pre-Retirement Class may retire early, they cannot make a claim under Section 203(a) either.

### 2. AT&T Did Not Breach Any Fiduciary Duty.

Plaintiffs' claims of fiduciary breach also independently fail as a matter of law, and they cannot support the individualized relief that Plaintiffs seek under ERISA § 502(a)(2).

*First*, Plaintiffs state no cognizable claim because they fail to identify a fiduciary *act*.  "In every case charging breach of ERISA fiduciary duty," the "threshold question" is "whether that person was acting as a fiduciary" in "taking the action" at issue.  *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) (citing 29 U.S.C. § 1002(21)(A)); *Livick v. Gillette Co.*, 524 F.3d 24, 30 (1st Cir. 2008) ("With no fiduciary function involved, there can be no breach of fiduciary duty.").

In this case, the challenged conduct is the "application of [JSA] Factors," SAC ¶ 156, but those factors are undisputedly binding Plan terms, and applying them to calculate benefits is not an exercise of fiduciary discretion.  The establishment of those plan terms is a settlor function for which "ERISA's fiduciary duty requirement simply is not implicated."  *Hughes Aircraft*, 525 U.S. at 444.  Similarly, "merely calculating benefits" pursuant to plan requirements "does not establish fiduciary status under ERISA."  *Lebahn v. Nat'l Farmers Union Uniform Pension Plan*, 828 F.3d 1180, 1186 (10th Cir. 2016).  And Department of Labor regulations explain that a person following such plan terms "does not have discretionary authority or discretionary control."  29 C.F.R. § 2509.75-8(D)(2).  Thus, the fiduciary claims fail.

*Second*, Plaintiffs' claims fail because they allege no cognizable fiduciary *breach*.  Following binding plan terms, which is all that Plaintiffs allege, is not a fiduciary breach.  On the contrary, "the administrator's duty is to . . . 'maintain[ ]' the plan according to its terms.  *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) (quoting  29 U.S.C. § 1102(a)(1)).  ERISA imposes no obligation on a fiduciary to ignore plan terms that may one day be subject to a potential legal challenge (such as the actuarial-equivalence provisions here).  *See, e.g.*, *Sec'y of Labor v. Macy's, Inc.*, 2022 WL

407238, at *5 (S.D. Ohio Feb. 10, 2022) ("the weight of . . . persuasive authority *rejects*" the argument that ERISA imposes "a duty to *disregard illegal plan terms*").

*Third*, Plaintiffs cannot seek individualized relief for a fiduciary claim under ERISA § 502(a)(2). This Section's purpose is to "give[ ] a remedy for injuries to the ERISA plan as a whole . . . not for injuries suffered by individual participants as a result of a fiduciary breach." *Wise v. Verizon Commc'ns Inc.*, 600 F.3d 1180, 1189 (9th Cir. 2010). Yet all Plaintiffs claim is a right to additional compensation for themselves, not that the Plan was injured. This Court previously "deferred questions of remedies," Dkt. 120 at 2, and noted that Plaintiffs' remedies "may . . . not be sustainable at summary judgment," Dkt. 47 at 20:3–8. The Court should at a minimum enter partial judgment rejecting Plaintiffs' request for individualized relief under their fiduciary breach theory. *See* SAC ¶¶ 158, 160.

*Fourth*, Plaintiff's fiduciary claim cannot apply to AT&T, Inc. because AT&T, Inc. is not "a fiduciary with respect to the plan." 29 U.S.C. § 1002(21); *see Acosta v. Pac. Enters.*, 950 F.2d 611, 617–18 (9th Cir. 1991) ("a fiduciary with respect to a plan" is determined by "a person's actions, not the official designation of his role"). Plaintiffs identify AT&T, Inc. only as the plan sponsor that contributes to the Plan, Ex. 4 at 30; SAC ¶¶ 39–41, but it is well established that "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). Without more, Plaintiffs' fiduciary breach claims against AT&T, Inc. must be dismissed. *E.g.*, *Collins v. Teamsters Benefit Tr.*, 2013 WL 12343709, at *10 (N.D. Cal. Dec. 27, 2013); *Bafford v. Northrop Grumman Corp.*, 994 F.3d 1020, 1026–28 (9th Cir. 2021).

### C.    Plaintiff Fisher Lacks Standing To Bring Any Claim Based on the JSA Factors, Requiring Summary Judgment on All Claims for the Pre-Retirement Class.

Plaintiffs include a single putative representative of a "Pre-Retirement Class," including those who have not yet commenced benefits. But in order to pursue their claims on behalf of a class, "class representatives must have Article III standing." *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 966 (9th Cir. 2019); *see also* Dkt. 121 at 15–17. Karen Fisher is the proposed Pre-Retirement Class representative, but she has never received a JSA and it is unclear if she ever will; indeed, she may not even be married by the time she retires, or may elect at that time to receive a SLA. *See* Dkt. 121 at 15–17. While Plaintiffs have alleged that Fisher has not elected a JSA yet due to dissatisfaction with the

Gibson, Dunn &
Crutcher LLP

JSA Factors, she admitted that this was incorrect in her deposition.  There, Fisher testified that she was "waiting until [her] full retirement age before [she] elect[s] to start drawing on [her] pension."  Ex. 17 at 42:19–23; *see also id.* at 49:11–17 ("Q: Have you looked into the options that are available to you?  A: No.  Q: Why not?  A: Because I'm not 65 yet.  Q: Any other reason?  A: No.").

Because Fisher is the only named plaintiff proposed as a representative of the putative Pre-Retirement Class, if this Court were to certify such a class, it would then need to grant summary judgment for AT&T for lack of standing.

### D.   Many of Plaintiffs' Claims Fall Outside the Statutes of Repose and Limitations.

Independently, many of the proposed Retired Class claims are also fatally time-barred.

**a.**   Plaintiffs' non-fiduciary ERISA claims are governed by the most analogous state-law statute of limitations.  The Plan contains a Texas choice-of-law provision, Ex. 4 at 87, and Plaintiffs have not disputed that the most analogous statute is Texas's four-year statute of limitations for breach of contract.  *See* Dkt. 37 at 9 ("[a]ssuming that Texas law applies," including "the four-year statute of limitations"); Dkt. 131 at 14 ("[t]here is a dispute between the parties regarding when the claims accrued," but *not* over the applicable limitations period).  "While the statute of limitation is borrowed from state law, *accrual* of an ERISA cause of action is determined by federal law."  *Gordon v. Deloitte & Touche, LLP Grp. Long Term Disability Plan*, 749 F.3d 746, 750 (9th Cir. 2014) (emphasis added).  For example, a claim for denial of benefits "accrues either at the time benefits are actually denied or when the insured has reason to know that the claim has been denied."  *Id.* (quoting *Wetzel v. Lou Ehlers Cadillac Grp. Long Term Disability Ins. Program*, 222 F.3d 643, 649 (9th Cir. 2000) (en banc)).

Plaintiffs agree that the statute of limitations began to run when they had reason to know of their claims—which they assert was not until just before filing suit.  Dkt. 131 at 15.  But they actually had reason to know long before that.  Their claims concern the value of annuity benefits written directly into the Plan and expressly disclosed to each Plan participant in communications—including the Notices—laying out the relative value of the available forms of benefit.  *Supra* Section II.B.  Plaintiffs do not dispute receiving notice of the JSA Factors, but assert that their legal significance was not sufficiently clear.  *See* SAC ¶ 88.  That is factually incorrect because Defendants provided specific,

detailed explanations to each Plaintiff of the comparative values of their available forms of benefit. *Supra* Section II.B.

Regardless, Plaintiffs' undisputed knowledge of the JSA Factors gave reason to know of their claims, thus triggering the statute of limitations. These simple facts distinguish other cases in which issues are so complicated that a plaintiff would not reasonably be aware of claims until consulting with counsel. *Cf. Pedersen v. Kinder Morgan Inc.*, 2022 WL 3643485, at *9 (S.D. Tex. Aug. 18, 2022) (citing cases where "plan communications involve information or formulae too complex or obscure for the layperson to decipher"). Here, there is nothing complex about Plaintiffs' benefit calculations, as Plan documents clearly explained long before the filing of this suit. Thus, Plaintiffs' claims "accrue[d], at the latest, when the participant[s] commenced [their] benefits." Dkt. 26 at 8–9; *see, e.g.*, *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521–22 (3d Cir. 2007) (ERISA claims for "underpayment" will "ordinarily . . . accrue[ ] upon [the plaintiff's] initial receipt of the [allegedly] erroneously calculated award"). At least four named Plaintiffs, and many proposed Retired Class members, commenced benefits more than four years before the filing of this action in 2020. *See* Ex. 3 at 17. The non-fiduciary claims of all such participants are thus untimely and must be dismissed on that ground.

**b.** Plaintiffs' fiduciary claims are governed by ERISA's express prohibition on actions filed "three years after the earliest date on which the plaintiff had actual knowledge of the breach." 29 U.S.C. § 1113(2); *see generally Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768 (2020). As explained, all Plaintiffs had actual knowledge of the alleged breach in this case no later than the date on which they commenced benefits. Beyond the other defects noted above with Plaintiffs' fiduciary breach theory, the Court separately should therefore dismiss as untimely the fiduciary claims of all parties who commenced benefits more than three years before the filing of this action.

## V. CONCLUSION

For the reasons stated above, the Court should grant summary judgment for Defendants and dismiss all of Plaintiffs' claims with prejudice.

Dated:  March 9, 2023                          GIBSON, DUNN & CRUTCHER LLP

                                               By:        /s/   Ashley E. Johnson

                                               Attorney for Defendants

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 3:20-CV-070940-JD

Gibson, Dunn &
Crutcher LLP