UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY SCOTT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AT&T INC., et al., <br><br> Defendants. | Case No. 20-cv-07094-JD <br><br> **ORDER RE SUMMARY JUDGMENT** |

On behalf of themselves and a putative class, named plaintiffs Timothy Scott, Patricia Gilchrist, Karen Fisher, Helen Maldonado-Valtierra, Dan Koval, Judy D. Duff,[1] John Griffin, Kenneth Rhodes, Judy Dougherty, John Kelly, Richard Walshon, Jennifer Fryer, and Vince Carabba allege that defendants AT&T Inc., the AT&T Defined Benefit Plan, and AT&T Services, Inc. (collectively AT&T) have violated the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001 *et seq.*). The operative complaint is the third-amended complaint (TAC). Dkt. No. 197.

The gravamen of the TAC is that the AT&T Defined Benefit Plan (the Plan) did not calculate and disburse "Joint and Survivor Annuities" (JSA) in a manner consonant with ERISA. Plaintiffs say the Plan failed to treat JSA and Single Life Annuity (SLA) participants in an actuarily equivalent fashion by using "mortality assumptions" that are "fifty years out of date," which resulted in the "payment of a benefit that is less" than the JSA beneficiaries were entitled to. *Id.* ¶¶ 76, 85.

The TAC presents four claims against AT&T: Counts I and III allege that the failure to ensure actuarial equivalence violated 29 U.S.C. §§ 1054(c)(3), 1055(d)(1)(B); Count II alleges an unlawful forfeiture of vested benefits in violation of 29 U.S.C. § 1053(a); and Count IV alleges that AT&T Services breached its fiduciary duties in violation of 29 U.S.C. §§ 1104(a)(1)(A). Dkt. No. 197 ¶¶ 117-64. The TAC makes these claims on behalf of two putative classes comprised of

---

[1] Plaintiff Duff was previously dismissed without prejudice by stipulation, Dkt. No. 114, but was re-alleged to be a plaintiff in the operative complaint, Dkt. No. 197 ¶ 33.

Plan participants (1) who "have not commenced receiving benefits"; and (2) who currently "are receiving a Joint and Survivor Annuity which is less than the value of their Single Life Annuity." *Id.* ¶¶ 106-16.

AT&T asks for summary judgment on all claims. Dkt. No. 153. While AT&T's motion was pending, plaintiffs were granted leave to amend the complaint to add Fryer and Carabba as representatives of the putative class of Plan participants who have not commenced benefits because Fisher, the prior representative for those individuals, had retired and started receiving JSA benefits. Dkt. Nos. 170, 195, 197. The Court permitted both parties to "file up to 5 pages of supplemental briefing that addresses only new arguments unique to the two newly substituted class representatives." Dkt. No. 216. This order addresses only those arguments raised in the original round of briefing, Dkt. Nos. 153, 168, 175, and those raised in the supplemental briefs that do not stray beyond the scope of the Court's order, Dkt. Nos. 218 at 1:1-5:9; 219 at 2:11-5:25. The concurrently filed motions under Federal Rule of Evidence 702, Dkt. Nos. 152, 154, will be addressed in a separate order.

The parties' familiarity with the record is assumed. Summary judgment is denied in main part.

**BACKGROUND**

The salient facts are not in material dispute. The Plan is an "employee pension benefit plan" and a "defined benefit plan" under ERISA. 29 U.S.C. §§ 1002(2)(A), (35); *see* Dkt. Nos. 197 ¶ 64; 153 at 4. The Plan "provides retirement benefit to substantially all U.S. bargained and non-bargained employees of AT&T Inc. and its subsidiaries," which number in the hundreds of thousands. Dkt. No. 197 ¶ 66. Benefits under the Plan are furnished through fourteen "Component Pension Programs," each of which has its own rules which may overlap with those of other programs.[2] *Id.* at Table 1; Dkt. Nos. 153-5 (Plan) at Supp. 1. Three of the programs are not at issue. The remaining eleven programs use set conversion factors to calculate JSA benefits, with

---

[2] AT&T's briefing suggests there are fifteen Component Pension Programs, Dkt. No. 153 at 4, but the Plan documents to which it cites list only fourteen, Dkt. No. 153-5 at ECF 100. The difference is not material here, and the Court proceeds on the understanding there are fourteen programs.

2

some slight variations across the programs that are not material here.[3] *See* Plan §§ 3.1(46)-(47); Dkt. Nos. 153 at 4-5; 168 at 3. Consequently, the Court need not review each of the eleven programs individually.[4]

Plan participants may elect SLA or JSA benefits as options. The SLA benefit is paid over the course of a single person's life. *See* Plan § 3.1(99). Under the Plan, "the normal retirement benefit is expressed as an SLA commencing at a participant's normal retirement age (typically defined as age 65)." Dkt. No. 153-2 (Abraham Rep.) ¶ 16. The JSA benefit is meant to last over the life of two individuals, typically the participant and his or her spouse. The JSA "benefit amount is adjusted downward to reflect the expectation that the payment will be over two lives instead of one," and that "the Plan will pay out a greater number of monthly payments" for JSAs. *Id.* ¶¶ 18-19. Because the SLA is the default benefit under the Plan, JSAs are calculated by multiplying the SLA amount by a conversion factor that is based on allocating the survivor, 50-100% of the participant's benefit.[5] *See* Plan §§ 3.1(46)-(48); Dkt. No. 153 at 5. For example, a Plan participant enrolled in the "AT&T Legacy Bargained Program and the AT&T Legacy Management Program" who elects a Joint and 50% Survivor Annuity "will receive his Pension Benefit as a reduced monthly benefit in an amount equal to [92%] of the amount" of the otherwise payable SLA, and "[a]fter such Participant's death, his Surviving Spouse will receive a survivor annuity equal to [50%] of the amount payable to such Participant under this Paragraph." Plan § 3.1(46)(b). If that same participant selected a Joint and 75% Survivor Annuity, they "will receive his Pension Benefit as a reduced monthly benefit in an amount equal to [88.5%] of the

---

[3] The Court uses the terms "conversion factors" and "tabular factors" interchangeably, as did the parties in their summary judgment papers.

[4] AT&T cites to the 2013 version of the Plan. *See* Dkt. No. 153 at 4; Plan at ECF 2. The record elsewhere contains the 2016 version of the Plan. Dkt. No. 119-7. Plaintiffs did not object to AT&T's reliance on the 2013 version, and neither party suggests there are material differences for present purposes. Consequently, the Court looks to the 2013 version that AT&T proffered in support of its motion for summary judgment.

[5] Some component programs include "early retirement factors or specify a formula" for reducing benefits if the participant commences their benefits before the normal retirement age. Abraham Rep. ¶ 19. These early retirement factors are not relevant to this order because they do not change the fact that JSA benefits are calculated based on certain set and static conversion factors. *See id.*

3

amount" of the otherwise payable SLA, and their surviving spouse would "receive a survivor annuity equal to [75%] of the amount payable." *Id.* § 3.1(47)(b).

It is undisputed the Plan does not state where the conversion factors for the JSA benefit calculations came from or how they were selected. In effect, the parties agree they are "black box" factors without a traceable origin. *See, e.g.*, Dkt. Nos. 153 at 10; 168-4 at 47:22-51:8.

ERISA does not require an employer to establish an employee benefits plan, or mandate what benefits must be provided if a plan is created. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). But if an employer establishes a plan, ERISA imposes a comprehensive body of requirements. In pertinent part here, ERISA states that, "in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit or amount." 29 U.S.C. § 1054(c)(3). For present purposes, this means that, if a participant elects an early retirement benefit, the early retirement benefit amounts must be the "actuarial equivalent" of an annuity commencing at normal retirement age. The statute also provides that a "qualified joint and survivor annuity" "means an annuity . . . which is the actuarial equivalent of a single annuity for the life of the participant." *Id.* § 1055(d)(1)(B). In the context of the Plan, these requirements mean that JSA benefits paid out to the participant and their surviving spouse, whether paid early or at normal retirement age, must be actuarially equivalent to the SLA benefit the participant could otherwise receive.

## LEGAL STANDARDS

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Broadcom Corp. v. Netflix*, 762 F. Supp. 3d 878, 882 (N.D. Cal. 2025) (citation omitted). Once the movant has curried its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "To determine whether there is a genuine dispute of material fact, the Court views the evidence in the light most

favorable to the non-moving party, and draws all justifiable inferences in its favor." *Gabriel v. Cnty. of Sonoma*, 725 F. Supp. 3d 1062, 1071 (N.D. Cal. 2024). "In resolving a summary judgment motion, it is not the Court's task 'to scour the record in search of a genuine issue of triable fact.'" *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 989 (N.D. Cal. 2017) (citation omitted), *aff'd subnom. Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019).

**DISCUSSION**

**I.   ACTUARIAL EQUIVALENCE**

Summary judgment is denied on Counts I and III with respect to the requirements of actuarial equivalence. *See* 29 U.S.C. §§ 1054(c)(3), 1055(d)(1)(B). AT&T says that plaintiffs cannot show the "Plan's tabular factors are not actuarially equivalent on a pooled basis" because ERISA permits the use of tabular factors for calculating benefits and does not require the use of "reasonable" or "up-to-date" assumptions to generate those tabular factors in this context. Dkt. No. 153 at 11-16. AT&T also says that "actuarial equivalence is viewed as a range" which can be "achieved using different methodologies." *Id.* at 3, 10. AT&T thus reads the "actuarial equivalent" requirements in Sections 1054 and 1055 to be satisfied so long as the JSA benefit amount an individual receives based on the Plan's chosen conversion factors falls within the "range" of amounts calculated to be equivalent by other reasonable actuarial methods, "regardless of how and when that conversion factor came to be." *Id.* at 15.

Plaintiffs say that ERISA does not permit a Plan to choose any assumptions it fancies for the conversion factors so long as the "broken clock is correct twice a day." Dkt. No. 168 at 18. In plaintiffs' view, a JSA benefit is the actuarial equivalent of a SLA benefit when it is "determined on the basis of consistently applied reasonable actuarial assumptions." *Id.* at 9.

The parties agree that "actuarial equivalent" as used in Sections 1054 and 1055 is a term of art. *See* Dkt. Nos. 153 at 9; 168 at 8. ERISA itself does not define "actuarial equivalent," expressly incorporate a definition from elsewhere, or otherwise indicate if the term of art connotes an implicit reasonableness requirement of the sort plaintiffs advance.

5

In this circumstance, the Court "assume[s] Congress intended that term of art to have its established meaning." *Stephens v. U.S. Airways Grp., Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011); *see Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, it is proper to explain them by reference to the art or science to which they are appropriate." (cleaned up)). The rub is that an established meaning here is not necessarily set in stone. Plaintiffs cite a Department of the Treasury regulation for "qualified trusts" under 26 U.S.C. § 401(a)(11), which states that "a qualified joint and survivor annuity must be at least the actuarial equivalent of the normal form of life annuity" and that "[e]quivalence may be determined, on the basis of consistently applied reasonable actuarial factors, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 1.401(a)-11(b)(2)(ii); *see* Dkt. No. 168 at 9. This regulation does not do all the work plaintiffs ask of it because it speaks of "actuarial factors," not "assumptions." The regulation does not directly answer the central question of whether the reasonableness is determined by reference to the factor's assumptions, as plaintiffs aver, or its results, as AT&T would have it.

The caselaw does not provide much additional help. Neither party cited an on-point Ninth Circuit decision, and the work of the other federal courts of appeal is not dispositive. In *Stephens v. U.S. Airways Group*, the D.C. Circuit construed "actuarial equivalent" to mean that "[t]wo modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." 644 F.3d at 440. *Stephens* did not address whether the "established meaning" of actuarial equivalence requires that the underlying assumptions be reasonable. The Second Circuit has observed that "ERISA [does] not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit" because such unbounded discretion "could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence." *Laurent v. PricewaterhouseCoopers LLP*, 794 F.3d 272, 286 (2d Cir. 2015) (discussing *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000)). But these comments are fairly characterized as dicta that were not essential to independent decisions about other ERISA violations, *see Laurent*, 794 F.3d at 281-85; *Esden*, 229 F.3d at 162, and so are of modest value as authority for plaintiffs' position. Among the district courts, there is no

6

consensus on this issue. *See, e.g.*, *Adams v. U.S. Bancorp*, 635 F. Supp. 3d 742, 748 n.4, 749-50 (D. Minn. 2022) (collecting and discussing cases).

Even so, plaintiffs have a good point. It does not take a leap of faith to conclude that "actuarial equivalent" would be understood by an actuary skilled in the art to connote the necessity of using reasonable assumptions. *See Stephens*, 644 F.3d at 440 (looking to a publication by the Society of Actuaries to discern the phrase's "established meaning" as a "term of art"). To that end, plaintiffs have adduced evidence from which a reasonable factfinder could conclude that an actuary would deem two values to be the "actuarial equivalent" of one another only if reasonable assumptions were used. Plaintiffs' expert, Ian Altman, opined that he "advise[s] [his] defined benefit plan sponsor clients that use of actuarial equivalence factors must at a minimum be current in terms of financial markets and future demographic expectations" based off his decades of experience and training. Dkt. No. 119-8 (Altman Rep.) at 10. Much of an actuary's training, he said, involves studying "advanced mathematics and statistics," the "construction of mortality tables," and "economics and modern portfolio theory to evaluate interest, earnings, and discount rates." *Id.* at 8. Altman explained that actuarial training focuses on "setting assumptions" because of the "implicit understanding that underlying conditions change over time." *Id.* at 9.

Altman also cited the Actuarial Standards of Practice (ASOP), which is guidance published by the Society of Actuaries, as further support of the observation that a practitioner would think it necessary to identify reasonable assumptions before determining actuarial equivalence. *See id.* at 9-10. For example, ASOP No. 27 "provides guidance to actuaries when performing actuarial services that involve selecting assumptions . . . for measuring defined benefit pension plan obligations" and plainly advises that an actuary "should use professional judgment to select reasonable assumptions." Actuarial Standards Board, ASOP No. 27: Selection of Assumptions for Measuring Pension Obligations §§ 1.1, 3.5 (effective date Jan. 1, 2025). It states that "an assumption is reasonable" if "it is appropriate for the purpose of the measurement," "it reflects current and historical data that is relevant to selecting the assumption," "it reflects the actuary's estimate of future experience, the actuary's observation of the estimates inherent in market data

7

. . ., or a combination thereof," and "it is expected to have no significant bias (i.e., it is not significantly optimistic or pessimistic)." *Id.* § 3.5(a)-(d).

ASOPs for other aspects of actuarial practice also emphasize the use of reasonable assumptions. *See, e.g.*, Actuarial Standards Board, ASOP No. 2: Nonguaranteed Elements for Life Insurance and Annuity Products § 3.5 (effective date June 1, 2022); Actuarial Standards Board, ASOP No. 4: Measuring Pension Obligations and Determining Pension Plan Costs or Contributions § 3.8 (effective date Feb. 15, 2023) (citing ASOP No. 27 for "guidance on the selection and assessment of assumptions"); Actuarial Standards Board, ASOP No. 17: Expert Testimony by Actuaries § 3.6 (effective date Dec. 1, 2018) (explaining that an actuary acting in the capacity of an expert witness in a judicial tribunal is "not relieve[d] . . . of the responsibility to comply with the Code, and to use reasonable actuarial assumptions and appropriate actuarial methods"), § 3.8 ("[T]he actuary may refuse to answer hypothetical questions based upon what the actuary believes in good faith to be unreasonable actuarial assumptions."); *see also* Actuarial Standards Board, ASOP No. 1: Introductory Actuarial Standard of Practice § 2.10 (effective date June 1, 2013) (noting that the ASOPs will often "call for the actuary to take 'reasonable' steps, make 'reasonable' inquiries, [or] select 'reasonable' assumptions or methods").

Overall, there are material disputes of fact about a reasonable actuary's understanding of "actuarial equivalence" with respect to underlying assumptions. The record also demonstrates that there are fact disputes about the reasonableness of the assumptions underlying the conversion factors used by the Plan. The undisputed evidence shows both that the relevant conversion factors were "for the most part incorporated into the Plan in 1984 and have not been updated in the 38 years since" and that AT&T does not actually how the Plan's conversion factors came to be or the assumptions (if any) upon which they are based. *See, e.g.*, Altman Rep. at 15-16; Dkt. Nos. 168-4 at 47:22-51:8; 168-5 at ECF 2. Altman hypothesizes, and AT&T does not dispute, the factors are "based on the 1971 Group Annuity Mortality table," which is based on "annuity data collected from 1964-68," and various interest rates between zero and five percent. Altman Rep. at 16; Dkt. No. 168-2 (Altman Rebuttal Rep.) at 12 n.23. Neither party suggests there is evidence to confirm that hypothesis. Plaintiffs also presented evidence indicating that AT&T's own actuaries voiced

8

concerns about the conversion factors being "out of date," Dkt. No. 168-5 at ECF 2, and Altman opines that, in his experience, a plan which uses static conversion factors for so long without any individualized modulation for beneficiaries is an outlier in the industry, *see* Altman Rep. at 18. This and related evidence provide a non-speculative basis from which a reasonable factfinder could conclude that the Plan's conversion factors, and the assumptions on which those factors are based, would not be considered "reasonable" by an actuary exercising his or her professional judgment. *See* ASOP No. 1 § 2.10 (requirements to "select 'reasonable' assumptions" are intended to "call upon the actuary to exercise the level of care and diligence that, in the actuary's professional judgment, is necessary to complete the assignment in an appropriate manner").

AT&T's efforts to overcome these factual disputes are unpersuasive. AT&T says that there is no dispute with respect to "the key question in this case is whether the conversion factors produce actuarially equivalent JSA benefits. The assumptions or inputs . . . that were used, if any, to derive a conversion factor are irrelevant to that issue." Dkt. No. 153 at 10 (emphasis and citations omitted); *see also* Dkt. No. 175 at 5. To bolster this suggestion, AT&T highlights snippets of deposition testimony from Altman. *See* Dkt. Nos. 153 at 10:13-15; 175 at 6-8. For example, Altman said that conversion factors "can be derived from interest and mortality tables. . . . They could be selected on a basis that the employer no longer knows what went into them. The relevant question is: When compared to conversion factors generated using reasonable actuarial assumptions, are they greater or equal to those reasonable assumptions." Dkt. No. 153-15 at 26:2-9. Altman also testified that "the real question is what were the conversion rates and how do they compare to conversion rates that would be generated by reasonable assumptions." *Id.* at 236:3-6; *see also id.* at 206:5-15.

The problem for AT&T is that it is not seeing the forest through the trees. Its curated snippets and excerpts overlook the much larger body of Altman's work, and do not in themselves demonstrate the absence of material factual disputes. Rather, the record as a whole indicates that, although Altman's opinions may be subject to vigorous cross-examination, they are grounded in evidence and sound methods, and are contrary to AT&T's arguments in many factual respects.

9

AT&T has not demonstrated that a rational factfinder could not credit the expert evidence on which plaintiffs rely.

AT&T says that, as a matter of law, there is no requirement to use reasonable assumptions implicit in Sections 1054 and 1055's "actuarial equivalent" requirements. AT&T goes too far. The case it principally relies upon, *Belknap v. Partners Healthcare System, Inc.*, *see* Dkt. No. 153 at 15, is readily distinguished. The court there expressly said "it does not appear that 'actuarial equivalence,' to the extent it is a term of art in the field, necessarily requires or implies 'reasonable' actuarial assumptions," "[n]either of plaintiff's experts so testified," and "it appears that it is industry practice to refer to the plan documents to determine the actuarial assumptions used to calculate an actuarially equivalent benefit." 588 F. Supp. 3d 161, 174-75 (D. Mass. 2022). Not so here, where the record is very different with respect to what constitutes actuarial equivalence in the field.

AT&T's other citations, *see* Dkt. No. 218 at 5 n.4, are to decisions on motions to dismiss, and so did not involve an evidentiary record like the one before the Court.[6] It also bears mention that one decision stated that the plaintiffs "[did] not allege that the industry practice is to apply reasonable assumptions to determine actuarial equivalence." *Drummond v. South. Co. Servs., Inc.*, No. 23-cv-00174-SCJ, 2024 WL 4005945, at *6 (N.D. Ga. July 30, 2024). Another deemed the plaintiffs' reliance on ASOPs alone insufficient to establish an understanding in the industry of actuarial equivalence that required the use of reasonable assumptions. *See Covic v. FedEx Corp.*, --- F. Supp. 3d ---, 2024 WL 5509315, at *4 (W.D. Tenn. Sept. 18, 2024). Plaintiffs' evidence is different in that regard, too.

To be sure, these decisions put an emphasis on the observation that Sections 1054 and 1055 do not specify "reasonable assumptions," whereas Congress did include a textual command

---

[6] AT&T's citations exceeded the scope of the Court's supplemental briefing order, *see* Dkt. No. 216, and so may properly be disregarded, but the Court addresses them in the interest of moving this case along. AT&T also cited *McCarthy v. Dun & Bradstreet Corp.*, Dkt. No. 153 at 15, but that case unremarkably noted that "ERISA does not specifically require that retirement plans periodically adjust their actuarial interest rates" and concluded that the record did not support finding that a 6.75% discount rate was in and of itself unreasonable. 482 F.3d 184, 206 (2d Cir. 2007). How those observations might be germane to the issues here was left unstated.

10

to that effect in other sections of ERISA. *See Covic*, 2024 WL 5509315, at *3; *Drummond*, 2024 WL 4005945, at *5; *Reichert v. Bakery, Confectionary, Tobacco Workers & Grain Millers Pension Comm.*, No. 23-cv-12343-SJM, 2024 WL 5410419, at *2 (E.D. Mich. Apr. 17, 2024).

The Court declines to conclude that this textual difference is dispositive in the circumstances of this case. In the other sections, Congress specified that certain amounts shall be determined "on the basis of actuarial assumptions and methods each of which is reasonable," 29 U.S.C. § 1085a(c)(3)(A), or "which, in the aggregate, are reasonable," *id.* § 1393(a)(1). None of those subsections use the term "actuarial equivalent," and several of them were enacted years after Congress mandated actuarial equivalence in Sections 1054 and 1055(d). *Compare* Pub. L. No. 93-406, 88 Stat. 829, 861 (1974) (creating Section 1054's "actuarial equivalent" requirement), *with* Pub. L. No. 113-97, 128 Stat. 1101, 1105 (2014) (adding Section 1085a's requirement that "all costs, liabilities, rates of interest, and other factors under the plan" be calculated based assumptions "each of which is reasonable"). Consequently, they provide no obvious guidance on what "actuarial equivalent" means in Sections 1054 and 1055. Their usefulness here is all the more attenuated because Congress mandated in the other provisions the use of a particular *set* of reasonable assumptions or methods. *See, e.g.*, 29 U.S.C. §§ 1055(g)(3)(A) (specific mortality tables), 1085a(c)(3)(A) (individually reasonable assumptions), 1393(a)(1) (assumptions reasonable in the aggregate). That Congress specified the use of certain reasonable assumptions for other purposes does not indicate that it intended to eliminate a requirement of reasonable assumptions in other parts of ERISA. The understanding of what "actuarial equivalent" means remains a term of art subject to factual disputes about its "established meaning" within the field. *See Stephens*, 644 F.3d at 440.

AT&T's remarks about the use of tabular factors in general and the assessment of equivalence on a pooled versus individual basis do not move the summary judgement needle. *See* Dkt. No. 153 at 11-16. Plaintiffs may not have proffered evidence establishing "the floor for actuarial equivalence," *id.* at 16-20, if actuarial equivalence is assessed solely with an eye to benefit amounts, but that is beside the point because plaintiffs contend that the statutory mandate requires analysis of the assumptions not just the benefit amounts.

## II. NONFORFEITURE PROVISION

Summary judgment is denied on plaintiffs' nonforfeiture claim, which alleges that the use of unreasonable assumptions led to underpayments under 29 U.S.C. § 1053(a). AT&T says that the nonforfeiture protection do not apply to early retirees because Section 1053 is said to apply "only to 'normal retirement benefit[s],'" and not "early retirement benefits." Dkt. No. 153 at 20 (citation omitted) (alteration in original).

The point is not well taken. Insofar as AT&T means to say that individuals who retire early are simply never afforded nonforfeiture protection under ERISA because they retired early, the plain text of Section 1053 makes the trigger for nonforfeiture protections the employee's "attainment of normal retirement age" not his "[retiring at] normal retirement age." 29 U.S.C. § 1053(a). AT&T improperly conflates the two concepts. *Cf. Contilli v. Local 705 Int'l Broth. of Teamsters Pension Fund*, 559 F.3d 720, 721-22 (7th Cir. 2009). Moreover, as plaintiffs point out, ERISA defines "[n]ormal retirement benefit" to be "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." 29 U.S.C. § 1002(22); *see* Dkt. No. 168 at 19. This plain language does not support AT&T's suggestion that, as a categorical matter, Section 1053(a) "does not apply to" individuals "who have commenced benefits payments . . . before normal retirement age." Dkt. No. 153 at 20-21 (emphasis omitted).

In a reply brief, AT&T says for the first time that, because plaintiffs "do not argue and have offered no evidence that the JSA payments they receive after retiring early are greater than those they would have received if they retired at age 65," *plaintiffs'* early retirement benefits are not subject to Section 1053's nonforfeiture protection. Dkt. No. 175 at 12. It cites a regulation stating that, where the benefit "is payable as an annuity in the same form upon early retirement and at normal retirement age, the greater benefit is determined by comparing the amount of such annuity payments." 26 C.F.R. § 1.411(a)-7(c)(2)(i); Dkt. No. 175 at 12.

Raising this new contention in a reply was a day late and a dollar short. The Court's standing order expressly prohibits such sandbagging. *See* Standing Order for Civil Cases ¶ 15. Consequently, the Court will not take it up here. *See In re San Benito Health Care Dist.*, No. 24-

12

cv-02266-JD, 2025 WL 885510, at *4 (N.D. Cal. Mar. 21, 2025) ("[T]he argument was not made in [a party's] opening brief and is deemed waived."); *see also, e.g.*, *Brown v. Rawson-Neal Psych. Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016).

### III. BREACH OF FIDUCIARY DUTY

Summary judgment is granted in favor of AT&T on the breach of fiduciary duty claim. "In every case charging breach of ERISA fiduciary duty . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see* 29 U.S.C. § 1002(21)(A). Plaintiffs say that AT&T "acted as a fiduciary when, in its absolute discretion, it failed to ensure that the Plan's conversion factors produced benefits that complied with ERISA." Dkt. No. 168 at 21. This is said to be so because "[t]he ongoing duty to monitor a plan's JSA conversion factors and update them if necessary . . . is directly analogous to the ongoing duty to monitor plan investments" previously recognized by the Supreme Court of the United States. *Id.*

But it is well settled that, when a plan sponsor establishes or amends plan terms, "they do not act as fiduciaries, but are analogous to the settlors of a trust." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443 (1999) (quoting *Spink*, 517 U.S. at 890). Consequently, AT&T was not acting as a fiduciary under ERISA when it established the use of the challenged conversion factors, and so that conduct cannot support a claim for breach of fiduciary duty. *See id.* at 443-44; *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1101-02 (9th Cir. 2004). So too for AT&T's decision not to change the conversion factors. The oversight and control of plan terms with which plaintiffs take issue are more analogous to the actions of "the settlors of a trust." *Hughes Aircraft*, 525 U.S. at 443 (citation omitted).

Plaintiffs also say that AT&T breached its fiduciary duties because "it administered the Plan in violation of ERISA's actuarial equivalence and anti-forfeiture requirements." Dkt. No. 168 at 21. The notion appears to be that the decisions to follow allegedly unlawful Plan terms to calculate JSA benefits pursuant to the challenged conversion factors are fiduciary acts. But

13

z

1    plaintiffs do not explain how following clear and mandatory Plan terms for the calculation of
2    benefits is an act which involves the exercise of discretionary authority or control, as is required to
3    be acting as a fiduciary under ERISA. *See* 29 U.S.C. § 1002(21)(A)(i), (iii). The reliance on *Fifth*
4    *Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420-21 (2014), is misplaced. That decision
5    pertained to the duty of prudence under section 1104(a)(1)(B), and the Court's brief mention of
6    section 1104(a)(1)(D), which requires plan administrators to follow governing plan documents
7    "insofar as such documents . . . are consistent with" ERISA, 29 U.S.C. § 1104(a)(1)(D), does not
8    support the reading plaintiffs presently advance. *See also Sec'y of Labor v. Macy's, Inc.*, No. 17-
9    cv-541-DRC, 2022 WL 407238, at *5, 9 (S.D. Ohio Feb. 10, 2022) (concluding the same).

## IV.    PRE-RETIREE STANDING

AT&T challenges the standing of named plaintiffs Fryer and Carabba, who currently work at AT&T, are fully vested, and are named as representatives of the putative class of individuals who "have not commenced receiving benefits." TAC ¶¶ 39-40, 106. AT&T says that Fryer and Carabba's claimed injuries are too speculative and so not "concrete." Dkt. Nos. 175 at 14; 218 at 1-2; *see also* Dkt. No. 153 at 22-23. Summary judgment is denied on this ground.

Because they seek to invoke federal jurisdiction, plaintiffs bear the burden of showing "(1) an 'injury in fact' (2) that is 'fairly traceable to the challenged conduct of the defendants' and (3) 'likely to be redressed by a favorable judicial decision.'" *Nat'l Fam. Farm Coalition v. Vilsack*, 758 F. Supp. 3d 1060, 1071 (N.D. Cal. 2024) (citation omitted). "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (internal quotations omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

"The elements of standing must be supported in the same ways any other matter on which the plaintiff bears the burden of proof, and so at summary judgment, a plaintiff must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken as true, that show a substantial probability of standing." *Vilsack*, 758 F. Supp. 3d at 1071 (cleaned up). Because Fryer and Carabba seek only injunctive and declaratory relief, *see*

14

Dkt. No. 219 at 1; TAC ¶ 19; *see also* Dkt. No. 119 at 2, the Court "'need not address standing of each plaintiff' at this juncture." *Vilsack*, 758 F. Supp. 3d at 1072 (quoting *Atay v. Cnty. of Maui*, 842 F.3d 688, 696 (9th Cir. 2016)); *see Olean Wholesale Groc. Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

The Court focuses on Fryer's claimed injury. It is undisputed that Fryer still works for AT&T and so has not elected or commenced her benefits yet. Dkt. No. 219-2 at 9:14-15, 41:7-12. She testified at her deposition that she intends to retire at "[a]pproximately around 55 years old" in "2027" "based on information that [she] had received . . . that if [she] retire[s] earlier than 55, [she] will be penalized in some way and won't receive as much money as [she] would if [she] were to retire later." *Id.* at 40:17-51:2. Fryer has been married to her current spouse since 2021. Dkt. No. 218-2 at 10:6-11. Under the Plan's terms, the JSA is the default benefit for a married participant, unless he or she "waives the JSA in favor of another form of payment." Dkt. Nos. 153 at 4 (discussing plan terms); Dkt. No. 153-16 at 40:11-17. Fryer repeatedly testified that "as long as [she is] married and have a spouse to potentially survive [her]" she intends to "elect[] the joint and survivor annuity form of benefit." Dkt. No. 219-2 at 65:9-15; *see id.* at 65:1-8, 84:20-24; *see also id.* at 46:21-47:3 ("I specifically want to make sure that my husband is provided for if I were to pass before him, so the joint annuity is more what I'm leaning towards."). There is no evidence suggesting that the Plan will be amended, or its administration relevantly changed, to vitiate the aspects with which plaintiffs take issue.

This record amply establishes a "'substantial probability' of standing," *Vilsack*, 758 F. Supp. 3d at 1071 (citation omitted), because Fryer faces a "substantial risk" of injury, *In re Zappos.com*, 888 F.3d at 1026 (citation omitted). AT&T advances a smattering of grounds for concluding otherwise, all of which are unpersuasive. In a rather muddled fashion, AT&T appears to suggest that the amount of time before Fryer retires, approximately two years from now, renders any alleged injury stemming from retirement too speculative. Dkt. No. 218 at 2. It cited no authority for this suggestion, and the Court cannot conclude based on this record that the time before Fryer's fifty-fifth birthday alone suffices to make her claimed injury speculative,

particularly because it does not rest on a "speculative multi-link chain of inferences." *In re Zappos.com*, 888 F.3d at 1026.

AT&T says that Fryer's testimony about intending to elect JSA benefits is just like the "'some day' intentions" the Supreme Court has held do not establish injury in fact. Dkt. No. 218 at 2 (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 564 (1992)). Not so. The evidence in *Lujan* showed no more than that the affiants had traveled to the area in question at some point in the past and they wanted to go back at some unknown, indeterminate point in the future. *See* 504 U.S. at 563-64. Fryer identified a specific point in the near future, and a particular reason in support thereof, which makes her intent to elect JSA benefits "far more certain than the intent to return to areas visited in the past alleged in [*Lujan*]." *Harris v. Bd. of Supervisors, LA Cnty.*, 366 F.3d 754, 762 (9th Cir. 2004). *Lujan* expressly noted that the evidence there lacked "description[s] of concrete plans" or "specification of *when* some day will be." 504 U.S. at 564 (emphasis in original); *see also Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 865 (9th Cir. 2017).

AT&T next says "it is unknowable right now whether [Fryer] will even be eligible for a JSA at that future date" because she may get divorced or her spouse may pass before her fifty-fifth birthday. Dkt. No. 218 at 3. Such speculation cannot defeat plaintiffs' evidence. *See, e.g.*, *WildEarth Guard. v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1159 (9th Cir. 2015). It is certainly true that an individual's short- and long-term fate are never certain, but standing is not measured by the randomness inherent in life. AT&T mentions that Fryer's two prior marriages ended in divorce, Dkt. No. 218 at 3; 218-2 at 76:5-77:10, in the apparent belief that her current one is doomed. But AT&T overlooks the equally plausible outcome that the third time is the charm. Overall, AT&T traffics in pure guesswork, which is not a reason to find Fryer lacks standing.

As a closing point, AT&T says that Fryer lacks standing because she might end up "better off under AT&T's method" than under plaintiffs' proposed method of JSA benefit calculation. Dkt. No. 218 at 4. AT&T suggests that "many plan participants are better off using AT&T's method" in that they receive more money under the current conversion factors than plaintiffs' proposed alternative.

The point may have some impact on class certification, which remains to be seen, but it is not well taken for purposes of individual standing. ERISA grants Fryer the right to sue to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or [] to obtain other appropriate relief [] to redress such violations." 29 U.S.C. § 1132(a)(3). "ERISA's core function is to 'protect contractually defined benefits.'" *Wit v. United Behav. Health*, 79 F.4th 1068, 1082 (9th Cir. 2023) (quoting *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013)); *see* Dkt. No. 219 at 5. The Ninth Circuit has recognized that ERISA claims can be sustained even in the absence of actual or knowable monetary injury to the plaintiff because of the "material risk of harm to Plaintiffs' interest in their *contractual benefits*." *Wit*, 79 F.4th at 1082 (emphasis added); *see also id.* ("Congress intended to make fiduciaries culpable for certain ERISA violations even in the absence of actual injury to a plan or participant." (quoting *Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 551 (9th Cir. 1990))). This reasoning fully applies to Fryer's non-fiduciary claims. For example, ERISA guarantees Fryer that her JSA benefits will be the actuarial equivalent of SLA benefits under the Plan. "[A]ccept[ing] as valid the merits of [plaintiffs'] legal claims" that her JSA benefits will not be actuarially equivalent because of the use of unreasonable assumptions, *FEC v. Cruz*, 596 U.S. 289, 298 (2022), Fryer faces a substantial risk that her JSA benefits will be calculated pursuant to an unreasonable methodology that results in less than she is entitled. *See Wit*, 79 F.4th at 1083 ("[A]lleged harm further includes the risk that their claims will be administered under a set of Guidelines that impermissibly narrows the scope of their benefits.").

The present unknowability of whether her benefits will be actuarially equivalent is also itself a harm, which "implicates [Fryer's] ability to make informed decisions" about benefits selection. *Id.* AT&T says that Fryer "has not consulted a financial advisor about her pension options and has not come to any conclusions at any point." Dkt. No. 218 at 2 (cleaned up). Yet Fryer testified that she has "concerns about retiring because of the fact that . . . with specific regard to this issue, I want to make sure that, you know, I and my spouse receive what we're entitled to under the law. So that's impacting my decision." Dkt. No. 219-2 at 39:13-19; *see also id.* at 40:4-6 ("I started to do some -- I've started to escalate my research into retirement over the

17

1 past couple of years in anticipation of retirement."), 46:5-9.  That evidence establishes, or at the
2 least shows there are fact disputes concerning, an impediment to Fryer's "ability to make informed
3 decisions." *Wit*, 79 F.4th at 1083.

## V.  STATUTE OF LIMITATIONS

Summary judgment is denied with respect to whether the nonforfeiture and actuarial equivalence claims of retired participants are time barred, without prejudice to AT&T's raising the question again if warranted by the evidence at trial.  The parties agree that, for present purposes, a four-year limitations period applies to plaintiffs' claims.  *See* Dkt. Nos. 153 at 23; 168 at 23 n.15.  Accrual is a question of federal law, and "an ERISA cause of action accrues either at the time benefits are actually denied or when the insured has reason to know that the claim has been denied." *Gordon v. Deloitte & Touche, LLP Grp. Long Term Disability Plan*, 749 F.3d 746, 750 (9th Cir. 2014) (citation omitted).  Neither party says plaintiffs' benefits were "actually denied" for purposes of the limitations period.  Instead, both focus on whether plaintiffs "had reason to know of their claims." Dkt. Nos. 153 at 23; 168 at 23-24; 175 at 15.  The two claims in question are based on the allegation that the benefits plaintiffs are receiving are not actuarially equivalent because of the use of unreasonable assumptions.

"A claimant has a 'reason to know' under the second prong of the accrual test when the plan communicates a 'clear and continuing repudiation of a claimant's rights under a plan such that the claimant could not have reasonably believed but that his or her benefit had been finally denied.'" *Withrow v. Halsey*, 655 F.3d 1032, 1036 (9th Cir. 2011) (citation omitted).  The sole basis AT&T advances for finding in its favor is that plaintiffs "had reason to know of their claims at least as early as their commencement of benefits because their claims concern the value of annuity benefits written directly into the Plan and disclosed to each Plan participant in communications laying out the relative value of the available forms of benefit." Dkt. No. 175 at 15; *see also* Dkt. No. 153 at 23-24.  The evidence on which AT&T relies does not establish that plaintiffs had "reason to know" their claims were denied at the time they commenced benefits, and so the defense fails at this juncture.

As AT&T notes, the Plan, with which plaintiffs were provided a copy, lists out the conversion factors used for calculating JSA benefits. Plan §§ 3.1(46)-(48). But the Plan does not disclose the assumptions on which the factors were based. And there is no evidence that either the named plaintiffs or the average participant would have been able to reverse engineer the possible assumptions on which the factors were based in the way Altman and AT&T's actuaries did. The "individualized Pension Modeling Statement" each plaintiff was given by AT&T, Dkt. No. 153 at 6 (discussing evidence), did contain "Relative Value" notices that AT&T says "provided specific, detailed explanations to each Plaintiff of the comparative values of their available forms of benefit." *Id.* at 23-24; *see, e.g.*, Dkt. Nos. 153-9 at 0057-59; 153-27 at 9170; 153-29 at 9234-35. AT&T concedes these notices presented relative values using assumptions which are not those upon which the Plan's JSA conversion factors are most likely based. *See* Dkt. Nos. 153 at 6-7; 153-22 at 179:25-180:14.

The notices disclosed that their calculations "may utilize different interest rate(s) as defined by the Program," but the notices said nothing about other possible assumptions (mortality tables). *E.g.*, Dkt. Nos. 153-9 at 0057; 153-29 at 9233. The notices directed participants to "call the Fidelity Service Center" if they "would like additional information regarding the life expectancy (mortality tables) and interest rate assumptions used." *E.g.*, Dkt. Nos. 153-27 at 9169; 153-29 at 9233. But AT&T does not say how that information, even if the named plaintiffs did reach out, would have given them notice of facts about the Plan's conversion factors and the assumptions on which they are based. Finally, AT&T does not explain, or adduce evidence to show, how plaintiffs would have "recognize[d] that the disparity" between the conversion factors and the relative value notice "had some significance worth further investigation." *Osberg v. Foot Locker, Inc.*, 862 F.3d 198, 207 (2d Cir. 2017).

In effect, AT&T says the retired plaintiffs should have pieced all this together as forensic ERISA analysts and so could not have reasonably believed but that their benefits had been denied. Dkt. No. 153 at 23. But ERISA does not demand or expect of participants such "a heroic chain of deductions." *Osberg*, 862 F.3d at 208. AT&T certainly did not cite any authority imposing so a heavy burden on participants like the retired named plaintiffs, and the circumstances here are

19

plainly worlds away from those in which the Ninth Circuit has found a plaintiff "had reason to know" his claim was denied. *See Withrow*, 655 F.3d at 1037-38 (summarizing and distinguishing *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026 (9th Cir. 2006)).

The out-of-circuit authority on which AT&T does rely is materially distinguishable. Dkt. No. 153 at 24. In *Miller v. Fortis Benefits Ins. Co.*, the Third Circuit held that the plaintiff's claim accrued "upon his initial receipt of the erroneously calculated award" on the ground that the "repudiation should have been clear to him upon initial receipt of payment . . . [because] a simple calculation of sixty percent of his salary should have alerted him that he was being underpaid." 475 F.3d 516, 522 (3d Cir. 2007). The alleged issue with named plaintiffs' JSA benefits here is far more complex than merely comparing two benefit amounts or completing simple multiplication, and other federal courts have recognized the significance of that distinction for limitations purposes. *See, e.g.*, *Faciane v. Sun Life Assur. Co. of Canada*, 931 F.3d 412, 418, 422 (5th Cir. 2019) (finding the alleged underpayment was "more similar [to] the percentage-of-earnings calculation at issue in *Miller*" because plaintiff did not "need to decipher complex formulae or piece together inferences from incomplete information"); *Osberg*, 862 F.3d at 207-08; *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 729 (D.C. Cir. 2012) (noting the issue required "apply[ing] complex law to complex facts" and "it makes no sense to ask the participants to navigate the complexity of ERISA's anti-backloading provision immediately upon receipt of their first benefits payment"); *Novella v. Westchester Cnty.*, 661 F.3d 128, 146 (2d Cir. 2011).

## CONCLUSION

Summary judgment is granted in favor of AT&T on Count IV of the TAC for breach of fiduciary duty. It is denied in all other respects.

**IT IS SO ORDERED.**

Dated: July 9, 2025

JAMES DONATO
United States District Judge